222 F.3d 633 (9th Cir. 2000)
 UNITED STATES OF AMERICA, Plaintiff-Appellee/Cross-Appellant,
v.
STEVEN J. HENKE, Defendant-Appellant/Cross-Appellee.
UNITED STATES OF AMERICA, Plaintiff-Appellee/Cross-Appellant,
v.
CHAN M. DESAIGOUDAR, Defendant-Appellant/Cross-Appellee.
 Nos. 99-10015, 99-10050
 
 Office of the Circuit Executive
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted April 10, 2000--San Francisco, California
Filed August 25, 2000
 [Copyrighted Material Omitted]
 Nina Wilder, Weinberg & Wilder, San Francisco, California, and Sanford Svetcov, Landels Ripley & Diamond, LLP, San Francisco, California, for the defendants-appellants.
 Laurie Kloster Gray, Assistant United States Attorney, San Francisco, California, for the plaintiff-appellee.
 Appeals from the United States District Court for the Northern District of California, D.C. No. CR-97-00294-VRW; Vaughn R. Walker, District Judge, Presiding
 Before: Mary M. Schroeder, Robert R. Beezer, and Stephen S. Trott, Circuit Judges.
 PER CURIAM:
 
 
 1
 Chan Desaigoudar and Steven Henke, former executives of California Micro Devices, Inc. ("Cal Micro"), appeal their convictions for conspiracy to make false statements to the Securities Exchange Commission (18 U.S.C. S 371), making false statements (18 U.S.C. S 1001), securities fraud (15 U.S.C. SS 78m(a), 78ff(a)), and insider trading (15 U.S.C. SS 78j(b), 78ff(a)). The government cross-appeals the defendants' sentences.
 
 
 2
 The defendants claim that their convictions must be set aside because a conflict of interest prevented their counsel from cross-examining a key government witness and because there was insufficient evidence to support their insider trading convictions. They also argue that the district court erred in admitting lay opinion testimony and an out-of-court statement into evidence, and in failing to conduct an in camera review of government notes from an interview with a key government witness to ensure that the notes did not contain information that the government was required to disclose to the defense. Finally, they claim that the prosecutor committed misconduct in forcing Desaigoudar to testify that various government witnesses were lying. We agree with the defendants that a new trial is necessary because their lawyers' ability to conduct their defense was impaired by a conflict of interest. We also agree that the district court erred in admitting lay opinion testimony on the key issue of knowledge. We disagree, however, that the evidence was insufficient to support their insider trading convictions. We therefore remand the case to the district court for a new trial. While we address the defendants' remaining claims because they present issues that may recur on re-trial, because we vacate the convictionsand sentences, we do not address the government's sentencing appeal.
 
 BACKGROUND
 
 3
 This case arises from a false revenue reporting conspiracy carried out by Cal Micro executives in order to preserve the appearance that the company was a good investment option when in fact it was struggling financially. Cal Micro designs, manufactures, and markets electronic components and semiconductor products for the defense and electronics industries. The company was purchased in 1980 by Desaigoudar, who turned it into a multi-million dollar company during the 1980s. In addition to being Cal Micro's largest shareholder, Desaigoudar served as its Chief Executive Officer and Chairman of the Board until he was removed in 1994.
 
 
 4
 In 1993, Cal Micro had two objectives. It hoped both to attract a strategic outside partner to invest in the company and to raise about $40 million in outside capital through a second public offering. Making the company an attractive investment option for outside companies and private investors was crucial to achieving these objectives and Desaigoudar instituted an incentive-based stock option plan to motivate officers and managers to meet revenue goals. These goals became increasingly difficult to meet, however, because Apple Computers, one of the company's largest customers, substantially reduced its orders.
 
 
 5
 Unable to close the widening gap between revenue targets and actual sales, some Cal Micro executives devised a plan to make it appear on paper that the company was meeting its financial goals. Under Cal Micro's stated revenue recognition policy, revenue was recognized when an order was shipped. These Cal Micro executives began to deviate from this practice in several ways. They started: (1) recognizing revenue when some orders were received, rather than when shipped; (2) shipping orders earlier than requested in order to recognize the revenue during a certain fiscal period; (3) sending unwanted shipments; (4) creating false orders; and (5) executing "title transfers" falsely reflecting that products stored at Cal Micro had been purchased by a client.
 
 
 6
 While this was occurring, Cal Micro successfully negotiated an agreement with Hitachi under which Hitachi would purchase two million shares of Cal Micro stock at $23 a share. Cal Micro and its investment bankers also put in motion plans for a second public offering.
 
 
 7
 Things then took a turn for the worse. Those involved began to worry about the implications of the revenue scheme. Moreover, the company's plan to write off several million dollars in "bad debts" caused Cal Micro's investment bankers to balk at a second public offering. The Board eventually instituted an investigation and ultimately ousted Desaigoudar.
 
 
 8
 Desaigoudar and Henke, a former Chief Financial Officer, Vice President, and Treasurer of Cal Micro, were indicted on charges of conspiracy, making false statements, securities fraud, and insider trading. Surendra Gupta, Cal Micro's President during the revenue reporting scheme, was also indicted, but reached a plea agreement with the government shortly before trial was to begin. The central issue at trial was whether the defendants had early knowledge of the false revenue reporting scheme and whether they traded their stock because of this inside information. Several of Cal Micro's executive officers, including former co-defendant Gupta, testified that the defendants did have such early knowledge. The jury believed the government's witnesses and convicted the defendants.
 
 CONFLICT OF INTEREST
 
 9
 The defendants' principle claim is that they are entitled to a new trial because their attorneys worked under an actual conflict of interest that prohibited them from cross-examining one of the government's key witnesses, Gupta.
 
 
 10
 Before trial, Desaigoudar, Henke, and Gupta participated in joint defense meetings during which confidential information was discussed. Communications made during these pre-trial meetings were protected by the lawyers' duty of confidentiality imposed by a joint defense privilege agreement. Before trial was to begin, Gupta accepted a plea agreement and promised to testify for the government.
 
 
 11
 Desaigoudar's attorney then moved for a mistrial and to withdraw because his duty of confidentiality to Gupta under the joint defense agreement prevented him from crossexamining Gupta on matters involving information he learned as a result of the privileged pre-trial meetings. Henke's lawyer was also present at the joint defense meetings and felt that his duty to Gupta impaired his ability to adequately represent Henke.
 
 
 12
 The district court denied the motion to withdraw. It reasoned that any privileged impeaching information counsel learned about Gupta would not be known to new counsel and the defendants were therefore no worse off for being represented by their original attorneys. The court granted the motion for a mistrial to allow defense counsel to regroup after Gupta's plea.
 
 
 13
 Once the new trial began, Gupta testified for the government. Defense counsel conducted no cross-examination for fear that the examination would lead to inquiries into material covered by the joint defense privilege.
 
 
 14
 The issue for our decision is whether the government's use of a former defendant, with whom both Henke's and Desaigoudar's attorneys had an attorney-client relationship arising from a joint defense agreement, as a key witness at trial created a conflict of interest that impaired defense counsel's ability to defend their clients.
 
 
 15
 The joint defense privilege is an extension of the attorney-client privilege. It has been recognized by this Circuit since at least 1964. Waller v. Financial Corp. of America, 828 F.2d 579, 583 n.7 (9th Cir. 1987). A joint defense agreement establishes an implied attorney-client relationship with the co-defendant, here between Henke's and Desaigoudar's attorneys and Gupta. See United States v. McPartlin, 595 F.2d 1321, 1337 (7th Cir. 1979); Wilson P. Abraham Constr. Corp. v. Armco Steel Corp., 559 F.2d 250, 253 (5th Cir. 1977). The government concedes in its brief the existence of this privilege in this case.
 
 
 16
 This privilege can also create a disqualifying conflict where information gained in confidence by an attorney becomes an issue, as it did in this case. As the court said in Abraham Construction,
 
 
 17
 Just as an attorney would not be allowed to proceed against his former client in a cause of action substantially related to the matters in which he previously represented that client, an attorney should also not be allowed to proceed against a co-defendant of a former client wherein the subject matter of the present controversy is substantially related to the matters in which the attorney was previously involved, and wherein confidential exchanges of information took place between the various codefendants in preparation of a joint defense.
 
 
 18
 559 F.2d at 253; see also Westinghouse Elec. Corp. v. KerrMcGee Corp., 580 F.2d 1311, 1319 (7th Cir. 1978) (defense attorney breaches fiduciary duty if he uses information obtained in a joint defense meeting). Here, what Gupta allegedly said in confidence during pre-trial joint defense meetings about the defendants' presence at a critical meeting of Cal Micro executives was claimed to be at odds with his trial testimony for the government. This evidence put the two defense attorneys in a difficult position. Had they pursued the material discrepancy in some other way, a discrepancy they learned about in confidence, they could have been charged with using it against their one-time client Gupta. In fact, Gupta's lawyers had threatenedHenke's and Desaigoudar's attorneys with legal action if they failed to protect Gupta's confidences. Here is the text of the letter received by defense counsel:
 
 June 26, 1998
 Re: U.S. v. Desaigoudar and Henke
 
 19
 Dear [attorneys for defendants Desaigoudar and Henke]:
 
 
 20
 It has come to our attention you may be contemplating filing an ex parte in camera submission to Judge Walker outlining what you contend are the contradictory statements made by Mr. Gupta in what you have conceded was a joint defense privileged meeting.
 
 
 21
 Please be advised that we do not, waive, and at no point ever have waived the joint defense privilege. Please be further advised that we are aware of no legal basis upon which you have any right to breach the privilege and that we reserve Mr. Gupta's right to pursue any and all appropriate legal remedies for any unauthorized breach of the privilege.
 
 
 22
 Please consider this letter as a formal objection to any ex parte in camera submissions to Judge Walker of any joint defense privileged information.
 
 
 23
 Yours very truly,
 
 
 24
 [Signed] Attorneys for Suren Gupta
 
 
 25
 Under these circumstances, the district court erred in not fully acknowledging the conflict and then acting on its implications.
 
 
 26
 Nothing in our holding today is intended to suggest, however, that joint defense meetings are in and of themselves disqualifying. We stress that it was defense counsel in this case that timely moved for disqualification. As the Supreme Court said in Holloway v. Arkansas, the attorney "is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial." 435 U.S. 475, 485 (1978). There may be cases in which defense counsel's possession of information about a former co-defendant/government witness learned through joint defense meetings will not impair defense counsel's ability to represent the defendant or breach the duty of confidentiality to the former co-defendant. Here, however, counsel told the district court that this was not a situation where they could avoid reliance on the privileged information and still fully uphold their ethical duty to represent their clients. There is nothing in this record to suggest that the attorneys were doing anything other than attempting to adhere to their ethical duties as lawyers.
 
 
 27
 Few aspects of our criminal justice system are more vital to the assurance of fairness than the right to be defended by counsel, and this means counsel not burdened by a conflict of interest. Here, because of that conflict, the appellants' lawyers were constrained to impair yet another primary right of their clients: the right to cross-examine a witness who testified against them. By choosing to convert Gupta into a prospective witness shortly before the trial was scheduled to start, the government -which may not have anticipated this complication when it made a deal with Gupta -caused this problem, and should not now be heard to complain.
 
 SUFFICIENCY OF THE EVIDENCE
 
 28
 The defendants also challenge the sufficiency of the evidence supporting their convictions for insider trading under Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. S 78j(b) (West 2000). Each contends that the evidence established that he sold his Cal Micro stock for innocent reasons and not because of information about the company's false revenue reporting.
 
 
 29
 We may reverse a jury conviction for insufficient evidence only if, viewing the evidence in the light most favorable to the government, no rational jury could have found the essential elements of the crime beyond a reasonable doubt. SeeJackson v. Virginia, 443 U.S. 307, 319 (1979). In this case, we look to whether the evidence supports a finding that the defendants traded stock on the basis of material nonpublic information with an intent to deceive, manipulate, or defraud. See United States v. Smith, 155 F.3d 1051, 1068-69 (9th Cir. 1998), cert. denied 525 U.S. 1071 (1999).
 
 
 30
 With respect to Desaigoudar, the jury heard evidence that he sold a portion of his stock after learning of Cal Micro's false revenue reporting scheme and that his sudden decision to "diversify" his portfolio came after receiving this information. Moreover, Desaigoudar's financial adviser had been advising Desaigoudar to diversify since 1986, but Desaigoudar only sold his stock in 1994 after the revenue reporting scheme surfaced. This evidence permits the inference that Desaigoudar traded on the basis of inside information and acted with the requisite scienter. Although Desaigoudar sold only a small portion of his Cal Micro stock, cf. In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1427 (9th Cir. 1994), his overall pattern of trading Cal Micro stock, when viewed in the light most favorable to the government, supports the jury's verdict.
 
 
 31
 Henke relies on our law that when there is evidence that an investor had a preexisting pattern or plan of trading and continued to execute that plan even after coming into possession of material nonpublic information, such evidence negates an inference that the investor acted with the scienter required for an insider trading conviction. See Smith, 155 F.3d at 1068; In re Worlds of Wonder, 35 F.3d at 1427-28. In Henke's case, however, the "preexisting pattern" of trading consisted of only two stock sales. Moreover, these sales netted him a relatively small return. The sale made after knowledge of the revenue scheme enabled him to avoid hundreds of thousands of dollars of loss in the stock's value. In addition, Desaigoudar's executive assistant testified that Henke told her that she would be stupid not to sell her own stock. When viewed in the light most favorable to the government, these circumstances permitted the jury to infer that the sales were the result of Henke's insider knowledge and not an earlier plan. We therefore conclude that sufficient evidence supports both Henke's and Desaigoudar's insider trading convictions.
 
 
 32
 Desaigoudar also contends that some of the evidence the government presented as to when he obtained inside information varied from one of the dates alleged in the indictment. There is no material variance or even inconsistency. See United States v. Tsinhnahijinnie, 112 F.3d 988, 991 (9th Cir. 1997) (noting that a variance is immaterial where it is not of a character which could have misled the defendant at trial and there is no danger of double jeopardy). The government proved that Desaigoudar had inside information on the date alleged in the indictment.
 
 LAY OPINION TESTIMONY
 
 33
 The defendants argue that the district court erred in admitting lay opinion testimony on the issue of the defendants' knowledge. Proving that Desaigoudar and Henke had knowledge of the false revenue reporting scheme was critical to the government's case. Without establishing this knowledge, it could not carry its burden of proving beyond a reasonable doubt that the defendants knew that financial statements they made were false, or that they possessed material nonpublic information before trading their stock.
 
 
 34
 One of the witnesses the government used to prove knowledge was Wade Meyercord, Desaigoudar's replacement as Chairman of Cal Micro's Board of Directors. Over the defendants' objections, the prosecutor systematically and repeatedly asked Meyercord about the reasons for terminating the defendants and other officers of Cal Micro. This questioning was done in order to elicit Meyercord's conclusion that the defendants "must haveknown" about the revenue reporting scheme.[1] The defendants claim that it waserror to admit this testimony. We agree.
 
 
 35
 Under Federal Rule of Evidence 701, a lay witness's testimony in the form of an opinion is permissible only when it is helpful to understanding the witness's testimony or to the determination of a fact in issue. If the jury already has all the information upon which the witness's opinion is based, the opinion is not admissible. See United States v. Skeet, 665 F.2d 983,985 (9th Cir. 1982) ("If the jury can be put into a position of equal vantage with the witness for drawing the opinion, then the witness may not give an opinion."); Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence S 701.05 (2d ed. 2000) ("[L]ay testimony generally is not helpful on matters that are essentially a jury question, such as credibility issues."); see also United States v. Anderskow, 88 F.3d 245, 251 (3d Cir. 1996) (holding that a witness's testimony that a defendant "must have known" fails to meet the helpfulness requirement); United States v. Rea, 958 F.2d 1206, 1219 (2d Cir. 1992) (same).
 
 
 36
 Here the jury was in the best position to determine whether the defendants knew about the revenue scheme. Unlike Meyercord and the Board of Directors, the jury had the benefit of several years of discovery, investigation, and litigation to flesh out the facts. Moreover, it heard testimony from all of the key actors in the scheme. While Meyercord testified that the Board formed a special committee of independent directors to investigate the false revenue reporting scheme, he was not questioned about the facts that the investigation turned up or how those facts were discovered. Meyercord was simply asked about the Board's conclusion that the defendants "must have known" about the scheme--a conclusion that went to the primary question for the jury. Because the jury was in a superior vantage point to decide this issue, Meyercord's testimony that the defendants must have known about the revenue scheme was not helpful. Its admission was therefore error.
 
 OTHER ISSUES THAT MAY RECUR ON RETRIAL
 
 37
 In the event of retrial, there are three remaining issues that may recur. The defendants claim that the district court erred in admitting an out-of-court statement and refusing to review interview notes with a key government witness in camera to ensure that the notes did not contain information the government would be constitutionally or statutorily obligated to disclose. They also contend that prosecutorial misconduct occurred when the prosecutor required Desaigoudar to testify that government witnesses were lying. We address each in turn.
 
 1. Out-of-court statement
 
 38
 The first issue is whether the court properly admitted Desaigoudar's out-of-court response--"next question please" --to an accusation in a press conference that the defendants were "cooking the books." The district court found that the response was not unduly prejudicial and that, under the circumstances, the natural response to such an accusation would be to address or deny it. It therefore admitted the statement as an adoptive admission. See Fed. R. Evid. 801(d)(2)(B). It was within its discretion to do so. See United States v. Schaff, 948 F.2d 501, 505 (9th Cir. 1991).
 
 2. In camera review of interview notes
 
 39
 [8] The defendants also contend that the district court erred in failing to conduct an in camera review of the government's notes from interviews with Ron Romito, a key witness, to ensure that the notes did not contain information that should be produced as exculpatory material under Brady v. Maryland, 373 U.S. 83 (1963), as impeachment material under Giglio v. United States, 405 U.S. 150 (1972), or as witness statements under the Jencks Act, 18 U.S.C. S 3500 (West 2000). The government provided the defendants with a substantial amount of information about Romito, including FBI reports, declarations, and a copy of his plea agreement, but invoked the work-product privilege as to its pretrial interview notes. The defendants made no showing that they might discover something exculpatory or impeaching. Nor did they show that the notes were used or adopted by the witness. Accordingly, the defendants did not trigger thedistrict court's obligation to review the privileged notes in camera. See United States v. Boshell, 952 F.2d 1101, 1104-05 (9th Cir. 1991) (finding that the defendants failed to make a showing that notes were read or adopted by the witness and that the notes were therefore not subject to the Jencks Act production requirements).
 
 3. Alleged prosecutorial misconduct
 
 40
 Finally, the defendants claim that the government acted improperly in forcing Desaigoudar to testify on crossexamination that the government's witnesses were lying. During Desaigoudar's cross-examination, the prosecutor repeatedly forced him to say that several of the government's witnesses lied on the stand. After the judgments were entered in this case, we made clear that forcing a defendant to comment on the veracity of another witness's testimony is inappropriate. See United States v. Sanchez, 176 F.3d 1214, 121920 (9th Cir. 1999). In light of Sanchez, this line of questioning by the prosecutor was improper and must be avoided on retrial.
 
 CONCLUSION
 
 41
 The judgments of conviction are reversed, the sentences vacated, and the matters remanded for new trial or other proceedings consistent with this opinion.
 
 
 42
 REVERSED and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 In relevant part, the testimony was as follows:
 Q. [by the prosecution]: What happened next. . . ?
 A. [Meyercord]: There was another Board meeting in October of `94, so that the -later that month. I don't recall the exact date. At which time, if I recall correctly, we removed Mr. Desaigoudar as Chairman of the company, and I was elected Chairman.
 Q. Why did you remove -yeah, why did you remove Mr. Desaigoudar?
 [Defense counsel]: Objection, your Honor.
 The court: You can rephrase that counsel.
 Q. [Prosecution]: If you know, what -how did the Board reach that decision?
 [Defense counsel]: Your honor, that's simply an opinion that they reached -conclusion that they reached.
 The court: Well, no. I think the witness can testify as to the understanding that he has of the reason that the Board took that action. That's, I think, the appropriate question. All right? With that in mind, Mr. Meyercord, what is your understanding of the reason that the Board took the action which you did in removing Mr. Desaigoudar as Chairman of the Board?
 A. Because we felt there was -we removed Mr. Desaigoudar as Chairman because we felt there was a high probability that he knew that the revenues had been misstated and that we could not in good conscience leave him in that position.
 . . .
 Later, the prosecutor was permitted to elicit the following testimony from Meyercord concerning the Board's decision to fire Desaigoudar and to reject Henke's severance agreement.
 Q. [Prosecution]: . . . December 1st . . . was a decision made to terminate certain employees of the company?
 A. Yes.
 Q. And was that made at a Board meeting?
 A. Yes . . . .
 Q. Do you remember who was terminated?
 A. We terminated Mr. Desaigoudar. Mr. Henke had already resigned at that point. We terminated Mr. Gupta. I believe Mr. Chalaka, Mr. -who -am I missing somebody else?
 Q. Was it Mr. Romito?
 A. Yes, Mr. Romito.
 Q. And why were these people all terminated?
 [Defense counsel]: Objection, your honor.
 The court: I think the witness can testify as to what is his understanding of the reason that the Board took this action.
 [Meyercord]: It was our belief at that time--
 [Defense counsel]: Can I just state the grounds for the objection? Relevance and opinion.
 The court: Very well. Overruled. Q. [Prosecution]: You can answer.
 A. It was our belief at that time based on the evidence that we had that all of those individuals had -must have known about the misstatement of revenue.
 . . .
 Q. And directing your attention to the last paragraph on the first page [of minutes from the Board meeting] --
 A. Yes.
 Q. -Is the second sentence there -is that the reason these people were terminated?
 A. (Reviewing document.) Yes.
 Q. And is it because of reported financial irregularities? Do you see that?
 A. As stated in the minutes because of his apparently active participation in the previously reported financial irregularities, because [he] apparently intentionally withheld information from the Board and provided the Board with false and misleading information, the company would not advance Mr. Desaigoudar's costs and expenses in connection with any litigation or investigation in which he was or is named a defendant.
 Q. What does that mean?
 A. That meant that we were reasonably sure that--
 [Defense counsel]: Same objection, your honor. It's not relevant, particularly not relevant what this witness's opinion was.
 [Co-defense counsel]: And it's very prejudicial, opinion of a Board -your honor.
 The court: Well, the objection's overruled. It is relevant. It, obviously, is reflective of the conclusions drawn by the -by the Board of Directors at the time and --
 [Defense counsel]: That's right.
 The court: And, Ladies and Gentlemen [of the jury], you understand that that's what this evidence is, that you're going to have to make up your own mind with respect to the evidence that is submitted to you. All right.
 Q. [Prosecution]: Could you explain that last sentence, what that was about?
 A. That sentence says that the company would not provide money to Mr. Desaigoudar to defend himself in any action that might ensue here in any -any legal proceedings.
 Q. And did you also -was -was a finding made that he had intentionally withheld information from the Board?
 [Defense counsel]: Oh, this is leading, your honor.
 The court: This is leading, Ms. Merchant.
 Q. [Prosecution]: Does this document refer to a finding that was made -you know why --
 [Defense counsel]: It's the same --
 Q. [Prosecution]: -why the Board made this decision, Mr. Meyercord? [Defense counsel]: That's exactly the same thing, and it's opinion -calling for opinion and conclusion.
 The court: You've got the minutes in. You've got the witness's testimony. I think that's sufficient.
 Q. [Prosecution]: There's a reference -you made a reference earlier to the fact that Mr. Henke had resigned sometime earlier. Do you remember that?
 A. Yes.
 Q. And do you remember the circumstances of his resignation from your perspective as a Board member?
 [Defense counsel]: Irrelevant, your honor, his perspective as a Board member.
 The court: Well, why don't you rephrase the question.
 Q. [Prosecution]: Did Mr. Henke resign around this time period?
 [Defense counsel]: Did Mr. Henke do what?
 [Prosecution]: Resign around this time period.
 [Defense counsel]: That's been asked and answered.
 The court: She's setting the stage for the question. All right.
 A. [Meyercord]: Yes, he did.
 Q. And was -were you aware of the fact that he had negotiated a severance package?
 A. I became aware later, yes.
 Q. And do you know who he negotiated it with? Did you learn that?
 A. Yes. With Mr. Desaigoudar.
 . . .
 Q. . . . [C]ould you describe the nature of the compensation package that had been negotiated?
 A. (reviewing document). Yes. It says here that he would have had a consulting agreement for one year at 5,400-and-some-odd dollars per month.
 Q. Well, Mr. Meyercord, did the Board accept this severance packet?
 A. No, we did not.
 Q. Why not?
 [Defense counsel]: Well, I object to it, your honor, on the same grounds that we've objected to the other documents, that it's prejudicial, and it's -actually this is testimony.
 The court: Well, now, no speaking objections, Mr. Hallinan. What's the basis of the objection?
 [Defense counsel]: Well, first of all, under the circumstances, it's so prejudicial. That's one. Second of all, there's no basis for it, doesn't show any special knowledge. And third of all, it calls for an opinion of this witness.
 The court: Overruled. The witness may testify as to his understanding of the reason that the Board took the action which it did.
 A. [Meyercord]: The Board -the Board did not feel that a severance package for Mr. Henke was appropriate given the evidence we had in front of us.
 Q. What evidence was that?
 [Defense counsel]: Well, there, your honor. Object to that.
 The court: Objection overruled. A. The evidence that the revenue had been misstated.
 Q. Did you have an understanding as a Board -did you learn as a Board member what Mr. Henke's role was in that?
 A. I'm sorry?
 [Defense counsel]: Your honor, what relevance--
 [Meyercord]: I don't understand the question.
 [Defense counsel]: is that?
 The court: Objection overruled.
 [Meyercord]: Could you -I don't understand the question.
 Q. Did you learn in the investigation --
 The court: What was the witness's understanding of the facts?
 [Prosecution]: Right.
 Q. What was your understanding of the facts as they concerned Mr. Henke?
 A. My understanding of the facts were [sic ] that Mr. Henke must have known about this -about the revenue misstatements.
 [Defense counsel]: Well, I'll move to strike that. That is just an opinion, he `must have known.' That shouldn't even be before the jury, your honor.
 The court: Objection overruled.
 [Prosecution]: No further questions, your honor.
 
 
 BEEZER, Circuit Judge (Concurring):
 
 43
 I join the court's opinion only with respect to the sections entitled BACKGROUND and LAY OPINION TESTIMONY. Because the district court's error prejudiced both defendants and was not harmless, I would reverse the defendants' convictions and remand for a new trial. Because this ground is sufficient to order such relief, I would not address the other issues raised on appeal.