**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　　　*Plaintiff-Appellee,*

　　　　v.

ATUL BHAGAT,
　　　　　　　*Defendant-Appellant.*

No. 03-10029

D.C. No.
CR-01-20173-RMW

OPINION

Appeal from the United States District Court
for the Northern District of California
Ronald M. Whyte, District Judge, Presiding

Argued and Submitted
April 12, 2004—San Francisco, California
Submission Withdrawn September 1, 2004
Resubmitted July 6, 2005

Filed February 8, 2006

Before: Mary M. Schroeder, Chief Judge,
A. Wallace Tashima, and Johnnie B. Rawlinson,
Circuit Judges.

Opinion by Judge Rawlinson;
Dissent by Judge Tashima

**COUNSEL**

Mary McNamara, Swanson & McNamara LLP, San Francisco, California, for the defendant-appellant.

Amber S. Rosen, Assistant United States Attorney, San Jose, California, for the plaintiff-appellee.

## OPINION

RAWLINSON, Circuit Judge:

Appellant Atul Bhagat (Bhagat) challenges his convictions for insider trading; for securities tipping; and for obstructing the course of an SEC investigation.[1]

Because any new factual theory referenced by the government during closing arguments was introduced for the proper purpose of impeaching Bhagat's credibility, and did not effect a constructive amendment or material variance of the indictment; the instructions conveyed all of the elements needed to obtain a conviction on the obstruction charge; and sufficient evidence supports Bhagat's conviction, we affirm the judgment of conviction.

Because the court determined the amount of profit under a mandatory guidelines system, we remand the sentence pursuant to *United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (en banc).

## I.  FACTUAL and PROCEDURAL BACKGROUND

Bhagat's employer, Nvidia Corporation (Nvidia), successfully competed for a multi-million dollar contract to develop a video game console (the X-Box) for the Microsoft Corporation. Upon receiving the contract, Nvidia's Chief Executive Officer (CEO) sent a company-wide e-mail late Sunday night announcing the contract award. The next morning, Nvidia sent a number of follow-up e-mails. The first e-mail advised Nvidia employees that the X-Box information should be kept confidential. The other e-mails imposed a trading blackout on the purchase of Nvidia stock for several days, and required

---

[1]The government has withdrawn its cross-appeal challenging the sentence imposed.

Nvidia's employees to cancel any open or outstanding orders for Nvidia stock.

## A.  Insider Trading Allegations Against Bhagat

The government's theory of prosecution was that Bhagat read the CEO's Sunday night e-mail prior to purchasing Nvidia stock. To support this theory, the government introduced evidence that Bhagat arrived at work on Monday mid-morning, and that all of the company-wide e-mails were on his computer. The government also introduced evidence that roughly twenty minutes after the final company-wide e-mail was sent, Bhagat purchased a large quantity of Nvidia stock — his largest purchase in nearly three years. There was no direct evidence that Bhagat read any of the e-mail prior to executing his purchase. Instead, the government asked the jury to infer Bhagat's knowledge by virtue of the fact that he had probably read the original e-mail upon entering the office as a "normal, reasonable person" would.

Evidence was also presented that rumors about Nvidia and the X-Box contract began leaking in the industry the day after Bhagat purchased his stock, and the price of the stock rose sharply. Three days later, the news was made public and the price of Nvidia stock skyrocketed. Another four days later, Bhagat sold his stock, reaping a substantial profit.

Bhagat offered a different interpretation of the facts. He testified to conducting personal business for several hours upon reaching the office, and reading the company-wide e-mails at 1:00 p.m. — roughly forty minutes after he purchased the stock. Upon learning of the trading blackout, Bhagat attempted to cancel his trade by contacting his broker, who advised him that it was too late. However, Bhagat could not remember which branch of the trading company he contacted, nor the name, or even the gender, of the representative to whom he spoke. Bhagat made no further attempt to divest himself of the stock. He concluded that to do so would further

violate the trading blackout, although he sought no guidance from any Nvidia executive regarding his failure to cancel his pending trade.

To rebut the government's contention that his purchase of Nvidia stock was motivated by insider information, Bhagat testified that he purchased the stock after considering the general strength of the stock, and with the expectation that the company would win the X-Box contract. Bhagat introduced evidence that he was a consistent purchaser of technology-based stock. To counter the inference that he read the X-Box e-mail before executing his trades, Bhagat introduced evidence that, in a one-month period, he often did not send e-mails until after 1:00 p.m.

## B.    Tipping Allegations Against Bhagat

The prosecution sought to prove that Bhagat advised two friends to buy Nvidia stock before the X-Box information was officially released to the public. Less than one-half hour after Bhagat made his purchase, two of his friends, Puneet Mehrotra (Mehrotra) and Mamat Gill (Gill), purchased Nvidia stock. There was no direct evidence that Bhagat contacted Mehrotra or Gill prior to their purchases. However, Bhagat did send Gill an e-mail during the blackout period, the day after Gill purchased the Nvidia stock, containing a link to an internet article discussing Nvidia and the X-Box. Evidence was also introduced that Bhagat provided his real estate agent with the X-Box information before it was made public. Finally, Gill's purchase was his largest purchase of the year.

Bhagat denied telling anyone about the X-Box contract before it was made public. He countered the prosecution's evidence with the argument that a friend of Gill's, who worked for one of Nvidia's competitors, may have informed Gill of the X-Box contract award.

## C.   Reasons for the Increase in Nvidia's Stock Price

The parties disagree as to the reasons Nvidia's stock price increased between the time of Bhagat's purchase and the time the contract award was officially announced. The government's expert opined that the increase was primarily caused by rumors regarding Nvidia and the X-Box contract. Bhagat countered that the value of Nvidia's stock rose during this period primarily because Standard & Poor's (S&P) issued a listing announcement indicating that Nvidia was now part of an S&P stock index.

A number of witnesses, including Nvidia's CEO and a financial analyst, testified that stock prices generally rise after a listing announcement. The government's expert confirmed the existence of studies showing that technology-based stocks increase in value by ten percent after becoming listed. However, the expert qualified this observation by noting that the ten percent increase represented the aggregate increase over the course of several days to a few weeks. In light of Nvidia's past performances upon becoming listed in other indices, the expert opined that it was highly unlikely that the listing announcement in this case had such an immediate impact on the market. Thus, according to the expert, any price increases during this time were more likely attributable to the X-Box rumors, and not to the listing announcement.

## D.   Trial Proceedings

Bhagat was charged with insider trading, tipping, and obstructing an SEC investigation. The most hotly contested issue was whether the government adequately proved that Bhagat possessed prior knowledge of the X-Box contract award. The key provisions of the indictment are as follows:

> 5.   On . . . March 5 . . . NVIDIA entered into a contract with Mircrosoft to develop . . . a . . . processor for . . . the "X-Box."

6. On Sunday, March 5 . . . NVIDIA's president . . . sent an e-mail message to all NVIDIA employees, including BHAGAT, announcing the contract. The e-mail . . . predicted that "[i]f Xbox becomes as big as Sony Playstation, we generate about $2B in sales over 5 years."

7. On Monday, March 6 . . . , at 9:15 . . . NVIDIA's Vice President of Marketing sent an e-mail to all NVIDIA employees. The e-mail was entitled "xbox shhhhh . . ." and said:

. . . keep the xbox news quiet . . . . Mircrosoft plans to make the news public this Friday . . . [L]ets don't jinx it!

8. On March 6 . . . at . . . 12:23 . . . BHAGAT placed a market order to purchase 1000 shares of NVIDIA stock.

The principal theory of the prosecution during the trial was that Bhagat knew about the contract from reading his own e-mail. During cross-examination, however, the prosecutor also questioned Bhagat about conversations among his co-workers that he had heard that morning concerning the X-Box contract. This line of questioning set the stage for what the parties refer to as the "office 'abuzz' theory."

Defense counsel informed the court that because the indictment did not include an allegation that Bhagat learned about the X-Box contract through office conversation, that theory should not be permitted as part of the government's case. In the alternative, defense counsel requested an instruction informing the jury that the mere existence of an open cubicle environment may not, standing alone, give rise to an inference that Bhagat possessed insider information. Ultimately, the court authorized the government to present the argument, and declined to give the requested instruction.

During closing arguments, the government referenced the "office abuzz" theory in passing, stating that the jury should consider the fact that the office was "abuzz" with the news of the X-Box contract, and that Bhagat had to walk through the office to reach his cubicle. The government also repeatedly informed the jury that in order to find Bhagat guilty, the government would have to prove that he read the company-wide e-mails prior to purchasing the stock.

The jury convicted Bhagat of insider trading, of tipping Gill, and of obstructing an SEC investigation by making false statements to SEC investigators.

### E.   Sentencing Proceedings

The district court calculated the "total increase in value" attributable to Bhagat and his tippee. *See* U.S.S.G. § 2F1.2, Background Note (1998).[2] The district court measured Bhagat's profit by finding the difference between the price Bhagat and Gill paid for the stock, and the price at which they sold it. When combined, the pair's profits exceeded sixty thousand dollars, thereby triggering a five-level sentencing enhancement. U.S.S.G. § 2Fl.1(b)(1).

### F.   Post-trial Motions

Bhagat moved for acquittal on the basis of insufficient evidence. In the alternative, he sought a new trial on the same grounds he asserts in this appeal. The district court denied Bhagat's motions and Bhagat timely appealed.

---

[2] Although Bhagat was sentenced in 2003, the district court applied the 1998 version of the Sentencing Guidelines to avoid any *ex post facto* problems.

## II.  DISCUSSION

### A.  Standards of Review

The district court's decision to deny a motion for a new trial is reviewed for an abuse of discretion. *United States v. Peterson*, 140 F.3d 819, 821 (9th Cir. 1998). The decision to deny a motion for acquittal is reviewed *de novo*. *United States v. Johnson*, 357 F.3d 980, 983 (9th Cir. 2004). Allegations of constructive amendment or material variance are also reviewed *de novo*. *United States v. Adamson*, 291 F.3d 606, 612, 616 (9th Cir. 2002).

### B.  Constructive Amendment or Material Variance

A constructive amendment mandates *per se* reversal, however, a variance warrants reversal only if the defendant's "substantial rights" were affected. *Id.* at 615.

#### 1.  Constructive Amendment

**[1]** A constructive amendment exists if "there is a complex of facts presented at trial distinctly different from those set forth in the [indictment]," or if "the crime charged in the indictment was substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved." *Id.* at 615 (citations and alterations omitted).

Bhagat contends that the government's reference to the "office abuzz" theory introduced an alternative theory by which the jury could infer Bhagat's knowledge of the X-Box contract prior to the stock transaction. The government counters that it invoked the "office abuzz" theory for the limited purpose of impeaching Bhagat's credibility when he testified that he had not heard anyone mention the X-Box contract upon entering the office on Monday morning.

The government's conduct throughout the trial is consistent with its contention. The government repeatedly informed the jury that conviction should be based upon a determination that Bhagat had read the company-wide e-mails prior to executing his trades. It was only during cross-examination, after Bhagat denied reading the pertinent e-mails, that the government questioned Bhagat about whether he had heard any office chatter regarding the X-Box contract.

The district court judge, who heard the testimony at issue, denied the defense request to give an instruction regarding an "open cubicle" environment. The district court also permitted the government to include in its closing argument reference to Bhagat's work environment for the purpose of challenging Bhagat's credibility.[3] After the prosecutor expressly mentioned credibility, he immediately segued into the "office abuzz" reference. The district court overruled the defense objection, stating that "one can argue inferences. Whether they're reasonable inferences, that's up to the jury."

**[2]** We have previously held that evidence not referenced in the indictment may be admitted for "impeachment or other legitimate purposes," without effecting any changes to the indictment. *United States v. Kahan & Lessin Co.*, 695 F.2d 1122, 1125 (9th Cir. 1982). The record in this case reflects that the reference to the "office abuzz" theory was not intended to and did not amend the indictment. The facts pre-

---

[3]"It is the province of the trier of fact 'to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts.' " *United States v. Magallon-Jimenez*, 219 F.3d 1109, 1114 (9th Cir. 2000) (citation omitted). A reasonable inference could be drawn that Bhagat was not credible when he denied hearing about the X-Box contract despite the "cubicle configuration" of his workplace. And, of course, if Bhagat was not credible on that point, the jury could also find a lack of credibility as to his testimony regarding reading the e-mails. *See, e.g., Sea Hawk Seafoods, Inc. v. Alyeska Pipeline Serv. Co.*, 206 F.3d 900, 912 (9th Cir. 2000) ("It is logical to disbelieve even a plausible allegation if a witness makes it in the course of a generally implausible account.").

sented were not "distinctly different" from those in the indictment. Neither was "the crime charged in the indictment . . . substantially altered at trial." *Adamson*, 291 F.3d at 615 (citations and alterations omitted). That being so, no constructive amendment of the indictment occurred. Rather, the evidence was admitted for impeachment purposes, a practice we expressly approved in *Kahan & Lessin Co.*, 695 F.2d at 1125.

### 2.  Material Variance

**[3]** A material variance exists if a materially different set of facts from those alleged in the indictment is presented at trial, and if that variance affects the defendant's "substantial rights." *Adamson*, 291 F.3d at 615-16.

In *Adamson*, we concluded that there was a variance between the indictment and the proof at trial because the "misrepresentation specified in the indictment and the misrepresentation shown at trial" differed. *Id.* at 615. The misrepresentation charged in the indictment was the fact that computer servers had been upgraded. The court's instructions, however, allowed the jury to find the defendant guilty based on a misrepresentation regarding how the servers were upgraded. *Id.* We concluded that there was a variance because there was "but one set of facts with a single divergence, namely, the content of the misrepresentation that the defendant made." *Id.* (alteration, internal quotation marks and citation omitted).

**[4]** No similar situation exists in this case. At all times, the pertinent fact was that Bhagat was aware of the e-mails notifying employees of the X-Box contract award. Not only was there no jury instruction given regarding the "office abuzz" notion, the district court judge expressly declined to give a related instruction requested by defense counsel. The record does not support a claim of variance.

Bhagat's reliance on *United States v. Choy*, 309 F.3d 602 (9th Cir. 2002), is misplaced. In *Choy*, the defendant was

indicted for giving $5,000 to a public official. However, he was convicted "on the theory that giving the $5,000 to a private individual indirectly conferred value — the opportunity to receive bribes in the future — on a public official." *Choy*, 309 F.3d at 607. We found a fatal variance because the "facts upon which Choy was convicted cannot constitute the crime [of bribery]." *Id.* n.5. We concluded that the jury instructions and clarification enabled the jury to base a finding of guilt on a fact other than the element stated in the indictment. *Id.* at 607. As in *Adamson*, in *Choy* we focused on the extent to which the jury was steered toward a finding at variance with the indictment. *See Choy*, 309 F.3d at 607, *see also Adamson*, 291 F.3d at 615-16. Nothing of the sort occurred in this case, and the verdict reflected no material variance from the charges in the indictment.

## C. Jury Instruction for Obstructing an Agency Proceeding

**[5]** Bhagat was convicted under 18 U.S.C. § 1505 for the crime of obstructing an SEC investigative proceeding by making false statements to SEC investigators. The government was required to prove three elements: (1) that there was an agency proceeding; (2) that the defendant was aware of that proceeding; and (3) that the defendant "intentionally endeavored corruptly to influence, obstruct or impede the pending proceeding." *United States v. Price*, 951 F.2d 1028, 1031 (9th Cir. 1991) (citation omitted). Because Bhagat failed to object to the instructions as given, we review for plain error. *United States v. Delgado*, 357 F.3d 1061, 1065 (9th Cir. 2004).

Bhagat contends that the Supreme Court's decision in *United States v. Aguilar*, 515 U.S. 593, 599-601 (1995), added two additional elements going to *mens rea*: that his false statements must have the "natural and probable effect" of obstructing justice, and that he was aware of that effect. Bhagat asserts that we recognized the applicability of *Aguilar* to Section 1505 proceedings in our decision in *United States*

*v. Hopper,* 177 F.3d 824, 830-31 (9th Cir. 1999). We disagree.

**[6]** *Aguilar* did not involve obstruction of agency proceedings under 18 U.S.C. § 1505. Rather, the court in *Aguilar* addressed false statements made during the course of an agency's investigative proceeding that obstructed a *judicial* proceeding pursuant to 18 U.S.C. § 1503's "catchall" provision.**⁴** The Supreme Court noted that judicial proceedings are distinct from government investigations, and that the intent to obstruct an agency proceeding did not automatically demonstrate intent to obstruct the related judicial one. *See Aguilar*, 515 U.S. at 599-601. To transpose the intent to obstruct an agency proceeding into the judicial proceeding context, the Court held that there had to be a "nexus" between the two proceedings. *Id.* at 599. The Court then held that the jury could infer the existence of that nexus if the "natural and probable effect" of the defendant's conduct *vis á vis* the agency proceeding would obstruct justice. *Id.*

**[7]** Because Bhagat was charged under Section 1505 with obstructing an agency proceeding and not a judicial one, there was no need to create a causal nexus and, consequently, no need to supplement the *Price* instructions with additional elements. *Cf. United States v. Gabriel*, 125 F.3d 89, 103-04 (2d Cir. 1997) (declining to incorporate a nexus requirement into 18 U.S.C. § 1512(b), the witness tampering statute); *Aguilar*, 515 U.S. at 601 & n.2 (distinguishing *Aguilar* from cases where false statements were made directly in the relevant proceedings).

Bhagat's reliance on *Hopper,* 177 F.3d at 830-31, fails for

---

**⁴**18 U.S.C. § 1503 contains a "catchall" provision prohibiting the obstruction of "the due administration of justice." That provision has been interpreted as encompassing judicial proceedings. *See, e.g.*, *Aguilar*, 515 U.S. at 598-99; *United States v. Veal*, 153 F.3d 1233, 1250 (11th Cir. 1998).

similar reasons. In *Hopper*, the defendants were charged with obstructing the IRS's attempt to collect on a tax judgment. *Id.* at 830. The *Hopper* defendants argued that they were wrongfully charged under 18 U.S.C. § 1505, because their interference was with a court judgment, not an agency proceeding. *Id.* Citing to *Aguilar,* we disagreed, stating that the defendants' attempt to avoid payment of the tax would have the "probable and natural effect" of interfering with the IRS's attempt to collect taxes. *Id.* We used *Aguilar*'s "natural and probable effect" language to explain how the defendants' conduct affected the IRS's collection proceeding, not to add an additional element of proof.

**[8]** Because the provided jury instructions adequately addressed the elements needed to obtain a conviction under 18 U.S.C. § 1505, Bhagat is not entitled to a new trial on this basis.

## D. Sufficiency of the Evidence

Evidence is sufficient to support a conviction if, considering the evidence in the light most favorable to the prosecution, any reasonable juror could have found the essential elements of the offense beyond a reasonable doubt. *United States v. Matthews*, 240 F.3d 806, 814 (9th Cir. 2001). For the following reasons, we hold that sufficient evidence supported Bhagat's convictions on all grounds.

### 1. Insider Trading

**[9]** To convict Bhagat of insider trading, the government was required to prove that he "traded stock on the basis of material, nonpublic information." *United States v. Henke*, 22 F.3d 633, 639 (9th Cir. 2000).

**[10]** The government offered significant evidence to support the jury's conclusion that Bhagat was aware of the confidential X-Box information before he executed his trades. The

X-Box e-mails were sent prior to his purchase. The e-mails were found on his computer. Bhagat was at his office for several hours prior to executing his trade, which provided him the opportunity to read the e-mails. Finally, Bhagat took virtually no action to divest himself of the stock, or to inform his company that he had violated the company's trading blackout. The fact that this evidence was all circumstantial does not lessen its sufficiency to support a guilty verdict. *See United States v. Messer*, 197 F.3d 330, 343 (9th Cir. 1999).

## 2.   Obstructing an Agency Proceeding

To convict Bhagat for obstructing an agency proceeding pursuant to 18 U.S.C. § 1505, the government was required to prove that an agency of the United States government was conducting a proceeding; that the defendant was aware of that proceeding; and that the defendant intentionally interfered with, or obstructed the course of, that proceeding. *Price*, 951 F.2d at 1031.

[11] Sufficient evidence also supports the jury's verdict on this charge. It is undisputed that there was an SEC investigative proceeding of which Bhagat was aware. The prosecution also introduced evidence that Bhagat intentionally obstructed that proceeding by providing the SEC investigators with false information to cover up his acts of insider trading and tipping and eliminate himself as a suspect.[5] *Cf. United States v. Boone*, 299 F.3d 1231, 1233-34 (9th Cir. 2000) (quoting from *Lilly v. Virginia,* 527 U.S. 116, 139 (1999)) (criminal suspects have a "natural motive to attempt to exculpate [themselves] as much as possible" while being questioned by law enforcement). No relief is warranted on this ground.

---

[5]This testimony included Bhagat's denying knowing anyone who purchased Nvidia securities during the week of the X-Box contract award and denying informing anyone outside of Nvidia of the contract award. Specific evidence to the contrary was introduced at trial by the prosecution.

### 3. Tipping

To convict Bhagat of tipping Gill, the government was required to prove that the tipper, Bhagat, provided the tippee, Gill, with material, inside information, prior to the tippee's purchase of stock. *See United States v. O'Hagan*, 521 U.S. 642, 675 (1997).

[12] Viewing the evidence in the light most favorable to the prosecution, we cannot say that no reasonable trier of fact could have found Bhagat guilty. Bhagat and Gill were friends; Bhagat had provided inside information to his real estate broker, with whom he shared a more distant relationship; Gill purchased stock shortly after Bhagat; and Gill's purchase was his largest purchase of the year. *See United States v. Larrabee*, 240 F.3d 18, 21-22 (1st Cir. 2001) (listing relevant factors).

### E. Sentencing

[13] Bhagat challenges the method used by the district court to calculate his gains. Because the district court's sentencing determinations were made under the then-mandatory Sentencing Guidelines, we remand for limited reconsideration under *Ameline*. *See United States v. Moreno-Hernandez*, No. 03-30387, 2005 WL 1560269, at *9 (9th Cir. July 5, 2005) ("conclud[ing] that a limited remand is proper in *all* pending direct criminal appeals involving unpreserved *Booker* error.") (emphasis in the original).

## III. CONCLUSION

The government's use of the "office abuzz" theory did not constructively amend the indictment or create a material variance between the facts alleged in the indictment and the evidence presented at trial.

The district court provided adequate jury instructions on the charge of obstructing an agency proceeding.

Sufficient evidence supported Bhagat's convictions on all counts.

A limited remand of Bhagat's sentence under *Ameline* is appropriate.[6]

**CONVICTION AFFIRMED, SENTENCE REMANDED.**

---

TASHIMA, Circuit Judge, dissenting:

Atul Bhagat ("Defendant") was charged in a seven-count indictment with: (1) securities fraud (insider trading) in violation of 15 U.S.C. §§ 78j, 78ff, and 17 C.F.R. § 240.10b-5 (Counts One and Two); (2) making false statements to the Securities and Exchange Commission ("SEC") in violation of 18 U.S.C. § 1001 (Counts Three, Four, Five, and Six); and (3) obstruction of justice in violation of 18 U.S.C. § 1501 by providing false information in an SEC investigation (Count Seven). After a trial by jury, Defendant was convicted of all counts, except Count Four.

Defendant is an engineer and was employed by NVIDIA Corporation, a Silicon Valley manufacturer of graphics processor and media communications devices. On March 5, 2000, NVIDIA entered into a contract with Microsoft to develop and manufacture a 3-D graphics processor for Microsoft's new video game console, the "X-Box." As to how Defendant obtained insider information about that contract, paragraphs 6 and 7 of the indictment alleged:

> 6.  On Sunday, March 5, 2000, at 11:04 p.m. PST, NVIDIA's president and chief executive offi-

---

[6]In view of this ruling, Bhagat's Motion for Supplemental Briefing is denied as moot.

cer sent an e-mail message to all NVIDIA employees, including BHAGAT, announcing the contract. The e-mail said that NVIDIA had obtained the X-Box contract from Microsoft. The e-mail revealed that Microsoft would "prepay" NVIDIA $200 million and predicted that "[i]f Xbox becomes as big as Sony Playstation, we generate about $2B in sales over 5 years."

7. On Monday, March 6, 2000, at 9:15 a.m. PST, NVIDIA's Vice President of Marketing sent an e-mail to all NVIDIA employees. The e-mail was entitled "xbox shhhhh . . ." and said:

> [The NVIDIA CEO] called me a few minutes ago (he is travelling) and asked that i remind everyone to keep xbox news quiet. Not a word to anyone outside of our walls. Lets let the news roll out in a controlled way. Microsoft plans to make the news public this Friday at GDC. But anything can happen; lets don't jinx it!

The indictment then charged, and Defendant does not contest, that later the same day (at 12:23 p.m.), he purchased 1,000 shares of NVIDIA stock at 61-3/4 and 61-7/8 per share. The contract was publically announced on March 10 and NVIDIA stock immediately and substantially increased in price. Defendant sold his shares for $110,000, reaping a profit in excess of $48,000.

The government's initial theory, consistent with the indictment, was that Defendant read the e-mails when he arrived at work that Monday morning, but there is no direct evidence that he did so. Defendant denied that he read the e-mails before placing his buy order and testified that he did not read

them until 1:00 p.m., approximately 40 minutes after he made his purchase.[1]

During its cross-examination of Defendant, the government pursued what the parties refer to as the "office abuzz" theory. The government's questioning of Defendant suggested that because of the open cubicle configuration of the office, Defendant could not help but overhear conversations among his co-workers regarding the exciting news of the X-Box contract — that the office was "abuzz" with the news. Defendant denied that he overheard any X-Box office conversation. The district court overruled Defendant's objection that the government should not be allowed to argue the "office abuzz" theory because "there is no evidence in the record the company was abuzz with the news," as indeed there was not, as a basis of liability. It also rejected Defendant's proffered instruction that "the mere existence of an open cubicle environment may not, standing alone, give rise to an inference that Bhagat possessed insider information."

Given that latitude, the government argued in closing that even if the jury could not infer that Defendant obtained insider information from the e-mails, it could draw that inference from the fact that the office was "abuzz" with information about the X-Box contract. Specifically, the prosecutor argued "[i]n terms of whether Bhagat possessed the information, you should consider the magnitude of this news. This was big, big, big news. The company [was] abuzz with this news." The prosecutor then walked the jury through the evidence that he claimed supported the "office abuzz" theory of liability:

> He [Defendant] walked through the reception area, he sat in a room filled with people, with cubicles with no doors, he went to the cafeteria, and he says,

---

[1] Defendant also testified that when he learned of the trading blackout he attempted to cancel his trade, but was unsuccessful.

> you know, he walked around in a bubble and this big news didn't reach him over the course of three hours with other people.

This "office abuzz" theory of liability as to how Defendant acquired insider information, an essential element of the charged crime,[2] is factually distinct from the theory charged in the indictment, that Defendant acquired the insider information through reading the company-wide e-mails. Because it is a new, uncharged theory, Defendant had no notice of it and no opportunity to defend against it, to rebut it with his own evidence.[3]

Thus, under our case law, this clearly is a case of a prejudicial variance from the indictment which requires reversal. This case is indistinguishable from *United States v. Choy*, 309 F.3d 602 (9th Cir. 2002). There the indictment charged that Choy "gave, offered, and promised a thing of value (to wit, $5,000.00) to a public official." *Id.* at 605. At trial, however, the government advanced an uncharged theory that Choy purchased computers to be used by a public official in a bribery scheme. *See id.* at 606. The district court instructed the jury that it could conclude that Choy "provided a thing of value" under either the theory charged in the indictment or the theory advanced at trial. *Id.* We reversed because the new theory was a variance that involved "a set of facts distinctly different

---

[2]Although the acquisition of insider information is technically an element only of the Count One charge — insider trading — factually, it is an indispensable predicate of all of the remaining counts of conviction.

[3]Accepting the government's contention, the majority asserts that the "office abuzz" theory was permitted to be "invoked" "for the limited purpose of impeaching Bhagat's credibility. . . ." Maj. op. at 1425. Yet, in rejecting Defendant's proposed instruction that this theory could not be a basis of liability, the trial court failed to give a limiting instruction that this theory, and any evidence in support of it, could be used only to assess Defendant's credibility and not as a basis of liability. Further, the government's closing argument, summarized above, belies its contention that the theory was invoked solely to impeach Defendant's credibility.

from that set forth in the indictment. *Id.* at 607. So too here, the "office abuzz" theory is a variance that involves "a set of facts distinctly different from that set forth in the indictment." *Id.*

We have previously observed that "[o]ne of the primary purposes of an indictment is to inform a defendant of 'what he is accused of doing in violation of the criminal law, so that he can prepare his defense.' " *United States v. Adamson*, 291 F.3d 606, 616 (9th Cir. 2002) (quoting *United States v. Tsinhnahijinnie*, 112 F.3d 988, 991 (9th Cir. 1997)). As in *Adamson*:

> This purpose was not served here. If the indictment had not specified a different particular misrepresentation, one might say the variance was benign. Having specified a different particular misrepresentation, however, the indictment not only failed to inform the defendant of the actual misrepresentation that would be shown at trial, but it also affirmatively misled the defendant and obstructed his defense at trial.

*Id.* Accordingly, I would conclude that the variance here affected Defendant's substantial rights and, thus, requires reversal. *See id.*

While paying lip service to the rule that "[a] material variance exists if a materially different set of facts from those alleged in the indictment is presented at trial, and if that variance affects the defendant's 'substantial rights' " (citing *Adamson*, 291 F.3d at 615-16), the majority elides the analysis required by that rule and simply concludes that "[a]t all times, the pertinent fact was that Bhagat was aware of the e-mails notifying employees of the X-Box contract award." Maj. op. at 1427. Yet, that is precisely the determinative issue that was hotly contested in this case. While it is uncontested that the two company-wide e-mails were transmitted, there is

no direct evidence that Defendant was "aware" of them; indeed, he denied that he read his office e-mails until 1:00 p.m. on Monday. Thus, the majority conveniently jumps to a conclusion that is unsupported by the record.

The majority's discussion of this issue concludes by noting that "[a]s in *Adamson*, in *Choy* we focused on the extent to which the jury was steered toward a finding at variance with the indictment." *Id.* at 1428 (citing *Choy*, 309 F.3d at 607; *Adamson*, 291 F.3d at 615-16). It then asserts that "[n]othing of the sort occurred in this case, and the verdict reflected no material variance from the charges in the indictment." *Id.* But what occurred in *Adamson* and *Choy* is exactly what occurred in this case: By permitting the government to argue in closing that insider liability could be predicated on the "office abuzz" theory, "the jury was steered toward a finding [acquisition of insider information] at variance with the indictment," which charged the acquisition of insider information solely from a reading of the company-wide e-mails. And the majority's assertion that "the verdict reflected no material variance from the charges in the indictment," *id.*, is a *non sequiter*. First, the majority's speculation of what the verdict may reflect is not the test under our variance jurisprudence. Second, the very reason for our variance jurisprudence is precisely because we cannot know whether "the verdict reflected no material variance from the charges in the indictment."

I therefore respectfully dissent from the majority's conclusion that "[t]he record does not support a claim of variance," *id.*, and from its holding affirming the judgment of conviction.