**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

   v.

JAMES L. GRAF,
    *Defendant-Appellant.*

No. 07-50100

D.C. No.
CR-04-00492-
MMM-1

OPINION

Appeal from the United States District Court
for the Central District of California
Margaret M. Morrow, District Judge, Presiding

Argued and Submitted
May 5, 2010—Pasadena, California

Filed July 7, 2010

Before: Diarmuid F. O'Scannlain and Richard C. Tallman,
Circuit Judges, and Frederic Block,* District Judge.

Opinion by Judge Tallman

---

*The Honorable Frederic Block, Senior United States District Judge for
the Eastern District of New York, sitting by designation.

## COUNSEL

Mark C. Krause (argued), Jill T. Feeney (argued), Michael J. Raphael, Christine C. Ewell, United States Attorney's Office,

Los Angeles, California; George S. Cardona, Acting United States Attorney, for plaintiff-appellee United States of America.

Mary F. Gibbons (argued), Toms River, New Jersey; Phillip A. Treviño, Law Offices of Phillip A. Treviño, Los Angeles, California, for defendant-appellant James L. Graf.

---

## OPINION

TALLMAN, Circuit Judge:

Once again we examine the complex relationship between corporate employees and corporate counsel—a delicate issue that can become particularly problematic when the latter are called to testify in opposition to the former during a criminal trial against the corporation's former officers. Defendant-Appellant James L. Graf was a founder of, and ostensible consultant to, Employers Mutual LLC ("Employers Mutual"), a Nevada corporation that purported to provide health care benefits coverage to more than 20,000 plan members. In reality, the company was part of an elaborate scheme to defraud the individuals and small businesses who purchased Employers Mutual health insurance plans.

Graf was indicted for his involvement in the fraudulent operation of Employers Mutual. The district court held an evidentiary hearing on Graf's motion in limine to exclude the attorneys' testimony and, after evaluating the briefing, written declarations, and oral testimony presented, issued an order allowing several attorneys who had represented Employers Mutual to testify against Graf at his criminal trial. The court found as fact that the attorneys represented only Employers Mutual and that Graf had no individual attorney-client relationship to establish a privilege that would be violated by the proffered testimony.

After the month-and-a-half long jury trial in Los Angeles, Graf moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure ("Rule") 29 challenging the ten counts charging misappropriation in connection with a health care benefit program in violation of 18 U.S.C. § 669. The district court reserved ruling on the motion until after the jury returned its verdict. The jury found Graf guilty of conspiracy, mail fraud, misappropriation, conducting unlawful monetary transactions, and obstruction of justice. The district court then denied Graf's Rule 29 motion and sentenced Graf to 300 months' imprisonment, with three years of supervised release, ordered a $2,300 special assessment, and imposed restitution of $20,458,419.47.

Graf now appeals his convictions. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

# I

## A

In the fall of 2000, Graf, William Kokott, and Graf's then-girlfriend, Kari Hanson,[1] formed Employers Mutual and sixteen related trade associations (the "Trade Associations"). Although the companies were organized under the laws of Nevada, Kokott, Graf, and Hanson all lived in California, and Graf originally operated Employers Mutual out of his home in Canyon Lake, California. Kokott filed all of the paperwork to incorporate the various entities; Graf was not listed as an employee, officer, or director of any of the companies. This is likely because Graf had previously been banned from insur-

---

[1]The grand jury that indicted Graf also indicted Kokott and Hanson. Because Kokott is now deceased, all charges against him have been dismissed. Hanson pled guilty, cooperated with the government investigation of Employers Mutual, and testified against Graf at his trial.

ance work in the state of California for misconduct in violation of state insurance laws.[2]

Evidence at trial nonetheless showed Graf was heavily involved in all facets of the corporation's operations. Between fall 2000 and December 2001 Graf, Kokott, and Hanson sold health care coverage to more than 20,000 people who joined health care benefit plans that Employers Mutual offered to members of the Trade Associations (the "Plans"). The Plans were designed as multiple employer welfare arrangements ("MEWAs"), which allow small businesses to band together to purchase health insurance for their employees at lower rates than the businesses could arrange individually.[3] *See* 29 U.S.C. § 1002(40). According to promotional materials prepared by Graf, customers who joined the Trade Associations, which were loosely based around a number of industries, could obtain low-cost medical benefits through the Association's health benefits plan.[4]

---

[2]On October 19, 1998, the California Insurance Commissioner ordered Graf and his company, Prime Care Health Network, Inc., to cease and desist from transacting insurance business in California and ordered Graf to pay all outstanding claims. On October 5, 2000, the California Insurance Commissioner again ordered Graf to stop soliciting people to join unauthorized health insurance programs, to stop transacting insurance without a license, and to pay all outstanding claims.

[3]MEWAs are governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* Most plans governed by ERISA are exempt from state regulation, *id.* § 1144(a); however, MEWAs must comply with both ERISA and relevant state insurance laws, *see id.* § 1144(b)(6).

[4]The Trade Associations included: American Association of Agriculture, LLC; Association of Automotive Dealers and Mechanics, LLC; Association of Barristers and Legal Aids, LLC; Communication Trade Workers Association, LLC; Construction Trade Workers Association, LLC; American Coalition of Consumers, LLC; Association of Cosmetologists, LLC; Culinary and Food Services Workers, LLC; Association of Educators, LLC; Association of Health Care Workers, LLC; National Alliance of Hospitality and Innkeepers, LLC; Association of Manufacturers and Wholesalers, LLC; Association of Real Estate Agents, LLC; National Association of Transportation Workers, LLC; and National Association of Independent Truckers, LLC.

Graf and Employers Mutual marketed the Plans to insurance agents, who in turn sold the Plans to individuals and employers. To convince the agents to purchase Employers Mutual's health care coverage, Graf misrepresented to insurance agents and the public that the Plans were insured through Sun Life of Canada, United Wisconsin Life Insurance Co., or Golden Rule Insurance Co. None of these companies ever insured Employers Mutual or any of the Plans. In making these misrepresentations, Graf ignored advice given by Employers Mutual's attorneys that the marketing of the Plans violated state and federal law.

In connection with his operation of Employers Mutual, Graf incorporated Colombia Health Network, Inc. ("Colombia"). Colombia was created to appear to be a preferred provider organization ("PPO"), an entity that contracts with doctors, hospitals, and other health care providers to arrange discounted payments for services for the PPO's customers. This allowed Graf and Hanson to funnel money from Employers Mutual into Colombia in exchange for services the company allegedly rendered to Employers Mutual. Colombia was actually a shell company designed to hide the diversion of approximately three-quarters of a million dollars in premiums paid to Employers Mutual. Graf and Hanson then used this money to purchase jewelry, a sports car, and a house.

In May 2001, Employers Mutual came to the attention of the Employee Benefits Security Administration of the U.S. Department of Labor (the "DOL"), which began investigating the company. Graf obstructed the DOL investigation in several ways. He told attorneys representing Employers Mutual to inform the DOL that the marketing of the Plans had ceased, even though Graf knew that to be false. He also told Employers Mutual employees to hide documents and information from DOL investigators conducting an on-site visit in October 2001. In response to DOL subpoenas to Colombia, Graf produced documents that purported to show that Colombia was

a PPO, run by Hanson, that provided services to Employers Mutual. Graf knew this information to be false.

In December 2001, the DOL filed a civil suit in the District of Nevada to: (1) remove Graf and Kokott from Employers Mutual; (2) install an independent fiduciary to operate the company; and (3) freeze the assets of Employers Mutual, Graf, and Kokott. On December 13, 2001, the Nevada district court installed an independent fiduciary, Thomas Dillon, to run Employers Mutual, and froze the assets of, among others, Employers Mutual, the Trade Associations, Colombia, Graf, and Kokott.

During its year of operation, Employers Mutual collected about $14 million in payments from individuals and employers for medical coverage. Of that amount, only $1,749,725.63 was used to pay medical providers who treated patients covered by the Plans. The amount of unpaid claims as of December 10, 2001, was a little over $20 million.

That $20 million represents thousands of victims whose medical bills were not paid by Employers Mutual. People who had purchased health insurance expecting to receive benefits instead received collection notices. A kidney dialysis patient was unable to receive a kidney transplant because Employers Mutual refused to process the request or even pay for his required dialysis. A woman suffering from breast cancer almost had her life-saving chemotherapy cancelled, and her reconstructive surgery was postponed for over a year due to Employers Mutual's failure to pay her medical bills. Several victims testified that they were unable to receive health care from their regular doctors because of thousands of dollars in unpaid medical bills. Others had trouble renting homes because of their ruined credit.

**B**

Graf was indicted for his role in the Employers Mutual fraud on April 29, 2004. Dillon, the independent fiduciary, waived Employers Mutual's attorney-client privilege with regard to all communications between Employers Mutual and the company's legal counsel: (1) Hugh Alexander and Stephen Fitzsimmons, (2) Michael Connors, and (3) Ralph Agnello.[5] Graf moved to exclude the testimony of these named attorneys,[6] arguing that he was a joint holder of the attorney-client privilege and had not waived the privilege. The district court held a hearing on October 4, 2005, to hear testimony and argument regarding the privilege issue.

After the hearing, U.S. District Judge Margaret M. Morrow denied Graf's motion to exclude the attorneys' testimony in a thoughtful and considered twenty-five page order issued October 11, 2005. First, she determined that Graf did not have a personal attorney-client relationship with the named attorneys to support his assertion of privilege over the relevant testimony because he had not sought personal legal advice from the corporate attorneys. Second, Judge Morrow determined that Graf's subjective belief that Employers Mutual's attorneys represented him personally was insufficient to create a personal privilege because that belief was either unreasonable or was not manifested to those attorneys.

**C**

Graf's jury trial began on October 5, 2005. The government presented over 100 witnesses, including Fitzsimmons, Connors, and Agnello. Alexander did not testify. During his testimony, Connors twice mentioned that Graf's behavior with

---

[5]The waiver also named other attorneys not at issue in this appeal.

[6]Other attorneys were addressed in the motion in limine but are not relevant to the appeal.

regard to Employers Mutual violated state law. Graf did not object to that testimony at the time.

The government rested its case on November 3, 2005. At the close of the government case, Graf moved for a judgment of acquittal pursuant to Rule 29 on, *inter alia*, Counts 7 through 16, charging misappropriation in connection with a healthcare benefit program in violation of 18 U.S.C. § 669.[7] Graf presented no evidence and immediately rested his own case, at which time he renewed his Rule 29 motion. In his motion, Graf argued that the government had failed to present evidence that the money diverted from Employers Mutual to Colombia was from insurance premiums rather than from Trade Association membership fees. Graf contended that because the Trade Associations were not health care benefit programs, but were instead membership associations, misappropriation of membership fees would not qualify as misappropriation from a health care benefit program under § 669. The district court reserved ruling on the motion until the jury returned with a verdict pursuant to Rule 29(b).

The jury verdict came on November 16, 2005. The jury found Graf guilty of: Count 1, conspiracy to commit mail fraud in violation of 18 U.S.C. § 371; Counts 2 through 6, mail fraud in violation of 18 U.S.C. § 1341; Counts 7 through 16, misappropriation in connection with a health care benefit program in violation of 18 U.S.C. § 669; Counts 17 through 21 and 26, conducting unlawful monetary transactions in violation of 18 U.S.C. § 1957; and Count 29, obstruction of justice in violation of 18 U.S.C. § 1503. The jury failed to reach a verdict on a tax evasion charge, Count 30, and the unlawful monetary transaction charges alleged in Counts 22, 23, 24, 27, and 28.

---

[7]The Rule 29 motion was also made as to several other counts not relevant to this appeal.

The district court accepted written submissions on the Rule 29 motion and heard oral argument on November 23, 2005. The court denied the motion from the bench at the close of the hearing. On February 5, 2007, the district court sentenced Graf to 300 months imprisonment and three years of supervised release; it also imposed a $2,300 special assessment and $20,458,419.47 in restitution.

Graf now appeals his convictions arguing that: (1) the attorney testimony presented at trial was privileged; (2) attorney Connors gave improper lay opinion testimony; (3) the district court erred in denying his Rule 29 motion as to Counts 7 through 16 for violation of 18 U.S.C. § 669; and (4) the district court should have unsealed various documents filed under seal by the government and reviewed in camera by Judge Morrow.

## II

**[1]** "[A] party asserting the attorney-client privilege has the burden of establishing the [existence of an attorney-client] relationship *and* the privileged nature of the communication." *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (quoting *United States v. Bauer*, 132 F.3d 504, 507 (9th Cir. 1997)). "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." *Id.* (quoting *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002)).

**[2]** An eight-part test determines whether information is covered by the attorney-client privilege:

(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from dis-

closure by himself or by the legal adviser, (8) unless the protection be waived.

*Id.* (quoting *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 n.2 (9th Cir. 1992)). "The party asserting the privilege bears the burden of proving each essential element." *Id.* at 608 (citing *United States v. Munoz*, 233 F.3d 1117, 1128 (9th Cir. 2000), *superceded on other grounds as stated in United States v. Van Alstyne*, 584 F.3d 803, 817 (9th Cir. 2009)).

**[3]** We here examine the fifth element, the identity of the client. It can be particularly challenging to determine the identity of the client in the corporate context. "The administration of the attorney-client privilege in the case of corporations . . . presents special problems. As an inanimate entity, a corporation must act through agents. A corporation cannot speak directly to its lawyers." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985); *accord Admiral Ins. Co. v. U.S. Dist. Court*, 881 F.2d 1486, 1492 (9th Cir. 1989) ("As fictitious entities, corporations can seek and receive legal advice and communicate with counsel only through individuals empowered to act on behalf of the corporation."). One of these special problems is that corporate officers, directors, and employees who communicate with corporate counsel on behalf of the corporation may later attempt to claim a personal attorney-client privilege regarding those communications after the corporation has waived its own privilege. A second problem is also raised in this case: whether an outside consultant's discussions with corporate counsel even fall within the corporation's attorney-client privilege.

The government asserts that any attorney-client privilege in this case belonged to Employers Mutual and was properly waived by the independent fiduciary. *See United States v. Plache*, 913 F.2d 1375, 1381 (9th Cir. 1990) (stating that when a corporation is placed in receivership the power to waive the attorney-client privilege on behalf of the corporation passes to the receiver). The district court agreed. It first

found that Graf had not sought personal legal advice from the corporate attorneys. *See In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 123 (3d Cir. 1986). The court then determined that Graf did not have a reasonable subjective belief, communicated to the named attorneys, that he was represented by the attorneys in his individual capacity.

Graf challenges these findings and claims that his communications with the named attorneys could not be disclosed to the government without his waiver. Graf's arguments on appeal center on his claimed status as an independent consultant to Employers Mutual. We hold that, on this record, as a matter of law Graf was a "functional employee" of Employers Mutual. We then adopt and apply the *Bevill* test to determine whether Graf held a personal attorney-client privilege with respect to his communications with the subject attorneys. We hold that he did not.

**A**

A district court's conclusion regarding whether "statements are protected by an individual attorney-client privilege is 'a mixed question of law and fact which this court reviews independently and without deference to the district court.' " *Ruehle*, 583 F.3d at 606 (quoting *Bauer*, 132 F.3d at 507). "We also review de novo the district court's rulings on the scope of the attorney-client privilege." *Id.* (citing *Bauer*, 132 F.3d at 507). The district court's "[f]actual findings are reviewed for clear error." *Id.* (citing *Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1196 (9th Cir. 2007)). A finding is clearly erroneous if it is illogical, implausible, or without support in the record. *United States v. Hinkson*, 585 F.3d 1247, 1261 (9th Cir. 2009) (en banc) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 577 (1985)).

**B**

Graf contends on appeal that he was not a director, officer, or employee of Employers Mutual, but was instead an outside

consultant. Although his briefing is far from clear, there appear to be two potential consequences of his status as an independent consultant. First, Graf argues that, because he was not an employee of Employers Mutual, his conversations with the attorneys should not have fallen within the company's corporate privilege under *Upjohn Co. v. United States*, 449 U.S. 383 (1981). Second, Graf contends that, because he was an independent but interested or related third party, he was a joint client of the named attorneys.

**[4]** Graf's arguments ignore his actual role at Employers Mutual. Although he had no official title, Graf regularly communicated with insurance brokers and others on behalf of Employers Mutual, marketed the company's insurance plans, managed its employees, and was the company's voice in its communications with counsel. The district court explicitly found that Graf was an agent of Employers Mutual and was authorized by Employers Mutual to communicate with its attorneys regarding legal matters that concerned the company. This factual finding is based on the evidence presented at the hearing that Graf was the attorneys' primary contact at Employers Mutual and that he discussed with them the legal affairs of the corporation.

Graf challenges this finding by referencing the terms of the California cease-and-desist orders, which provide that he could not lawfully act as Employers Mutual's agent or employee. The fact that Graf's actions were in violation of these administrative orders and state law is not determinative of his position as an agent in fact of Employers Mutual. The district court's conclusion is plausible, rational, and based on the record; therefore, it is not clearly erroneous. *See Hinkson*, 585 F.3d at 1261.

The district court next found that Graf's communications with Employers Mutual's counsel fell within the company's corporate attorney-client privilege under *Upjohn* and *In re Bieter Co.*, 16 F.3d 929 (8th Cir. 1994). In *Upjohn*, the

Supreme Court held that a corporation's privilege extends to communications between corporate employees and corporate counsel as long as the communications are "made at the direction of corporate superiors in order to secure legal advice." *United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996) (citing *Upjohn*, 449 U.S. at 390-94). The Eighth Circuit has applied *Upjohn* to cover communications between corporate counsel and outside consultants. *Bieter*, 16 F.3d at 937-38. The *Bieter* court reasoned that "too narrow a definition of 'representative of the client' will lead to attorneys not being able to confer confidentially with nonemployees who, due to their relationship to the client, possess the very sort of information that the privilege envisions flowing most freely." *Id.* The consultant at issue in *Bieter* was "involved on a daily basis with the principals of Bieter and on Bieter's behalf in the unsuccessful development that serve[d] as the basis for th[e] litigation," therefore, he was "precisely the sort of person with whom a lawyer would wish to confer confidentially in order to understand Bieter's reasons for seeking representation." *Id.* at 938 (citing *Upjohn*, 449 U.S. at 389). The court concluded that "he was in all relevant respects the functional equivalent of an employee." *Id.* (citing *McCaugherty v. Siffermann*, 132 F.R.D. 234, 239 (N.D. Cal. 1990)).

Several district courts in the Ninth Circuit have already applied *Bieter* to determine whether communications between an outside consultant and an entity's attorneys are covered by the entity's attorney-client privilege. *See Kelley v. Microsoft Corp.*, No. C 07-475 MJP, 2009 WL 168258, at *2-3 (W.D. Wash. Jan. 23, 2009) (considering and ultimately rejecting Microsoft's claim that a consultant was the functional equivalent of an employee under *Bieter*); *Davis v. City of Seattle*, No. C06-1659Z, 2007 WL 4166154, at *2-4 (W.D. Wash. Nov. 20, 2007) (applying *Bieter* to protect communications between an outside investigator and the City Attorney's Office for the purpose of securing legal advice for the City); *ASU Students for Life v. Crow*, No. CV-06-1824-PHX-MHM, 2007 WL 2725252, at *3 (D. Ariz. Sept. 17, 2007) (adopting

*Bieter* and applying it to extend attorney-client privilege to communications between attorneys and all members of student groups that were "directly involved" in the relevant project); *Memry Corp. v. Ky. Oil Tech., N.V.*, No. C04-03843 RMW (HRL), 2007 WL 39373, at *2-3 (N.D. Cal. Jan. 4, 2007) (adopting *Bieter* and finding that communications between an advisor/agent to the company and corporate counsel were covered by the company's attorney-client privilege); *Residential Constructors, LLC v. Ace Prop. & Cas. Ins. Co.*, No. 2:05-cv-01318-BES-GWF, 2006 WL 3149362, at *12-16 (D. Nev. Nov. 1, 2006) (discussing and applying *Bieter*, among other cases, to protect communications between an insurer's counsel and an independent insurance adjuster performing the same functions performed by an "in-house" claims employee); *cf. McCaugherty*, 132 F.R.D. at 238-29 (relied upon by the *Bieter* court and holding that the outside consultants had information necessary to allow corporate counsel to give the corporation fully informed legal advice and were, therefore, covered by the corporate attorney-client privilege).

**[5]** We find the reasoning in *Bieter* persuasive and adopt its principles in the Ninth Circuit. We hold that Graf's role at Employers Mutual was that of a functional employee. As discussed above, Graf communicated with insurance brokers and agents on behalf of Employers Mutual, and managed company employees. More importantly, Graf was the company's primary agent in its communications with corporate counsel. As we have previously noted, "[a]s fictitious entities, corporations can seek and receive legal advice and communicate with counsel only through individuals empowered to act on behalf of the corporation." *Admiral Ins. Co.*, 881 F.2d at 1492. The district court correctly held that Graf was that person.

**[6]** It appears that the sole reason Graf was not explicitly named a director, officer, or employee of Employers Mutual was because of the outstanding California cease-and-desist orders preventing him from lawfully being employed by an

insurance company in the State of California. We decline to define his relationship with Employers Mutual based on his own self-serving, fraudulent representations made to evade his legal restrictions and to avoid discovery by the California Insurance Commissioner. Because the record establishes that Graf was a functional employee, not an independent outside consultant to Employers Mutual, we reject his claim of entitlement to a jointly held attorney-client privilege with the company's attorneys. We must now consider whether Graf, as a functional employee of Employers Mutual, held a personal attorney-client privilege over any or all of his communications with the named attorneys.

## C

**[7]** We have yet to adopt a particular standard by which to determine whether a corporate employee holds a joint privilege over communications with corporate counsel. *See Ruehle*, 583 F.3d at 608 n.7 (stating that we did not need to adopt such a test in that case because the statements at issue were not privileged); *see also Munoz*, 233 F.3d at 1128 n.2 (declining to adopt, due to an insufficient record, the rule that an attorney-client privilege may exist where a party reasonably but mistakenly believes that an attorney represents him). The district court considered Graf's claim of privilege under two alternate theories used in other circuits: (1) whether Graf sought personal legal advice from the corporate attorneys under the test announced in *Bevill*, 805 F.2d 120 (the "*Bevill* test"); and (2) whether Graf had a reasonable subjective belief that the corporate attorneys represented him in his individual capacity. The court answered "no" to both questions and held that none of the proffered attorney testimony was privileged as to Graf.

**[8]** The government asks that we adopt the five-part test established in *Bevill* and applied by the district court in this case to help us determine whether Graf holds a personal attorney-client privilege. We think the issue is squarely pres-

ented here, and it is time to address it. In *Bevill*, the Third Circuit made clear that "any privilege that exists as to a corporate officer's role and functions within a corporation belongs to the corporation, not the officer." *Id.* at 124. Under the *Bevill* test, individual corporate officers or employees seeking to assert a personal claim of attorney-client privilege must affirmatively show five factors:

> *First*, they must show they approached counsel for the purpose of seeking legal advice. *Second*, they must demonstrate that when they approached counsel they made it clear that they were seeking legal advice in their individual rather than in their representative capacities. *Third*, they must demonstrate that the counsel saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise. *Fourth*, they must prove that their conversations with counsel were confidential. And *fifth*, they must show that the substance of their conversations with counsel did not concern matters within the company or the general affairs of the company.

*Id.* at 123, 125 (quoting *In re Grand Jury Investigation*, 575 F. Supp. 777, 780 (N.D. Ga. 1983)) (brackets omitted and emphases added).

The *Bevill* test has been adopted and applied by several of our sister circuits. The First, Second, and Tenth Circuits have expressly done so. *See, e.g.*, *In re Grand Jury Subpoena (Newparent)*, 274 F.3d 563, 571-72 (1st Cir. 2001); *In re Grand Jury Subpoenas (Roe and Doe)*, 144 F.3d 653, 659 (10th Cir. 1998); *In re Grand Jury Proceedings*, 156 F.3d 1038, 1040-41 (10th Cir. 1998); *United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 214-15 (2d Cir. 1997). The Sixth Circuit has implied that it too applies this test in the corporate context or, at the very least, that a corporate employee must make it clear to counsel that he seeks advice on personal mat-

ters. *See Ross v. City of Memphis*, 423 F.3d 596, 605 (6th Cir. 2005) ("Our court, like many others, requires that the individual officer seeking a personal privilege '*clearly* claim[ ]' he is seeking legal advice in his individual capacity." (citing, *inter alia*, *Bevill*, 805 F.3d at 123)*).*[8]

Moreover, several district courts in our circuit, including the district court in this case, have applied the *Bevill* test to determine privilege issues involving corporate employees. *See SEC v. Nicita*, No. 07CV0772 WQH (AJB), 2008 WL 170010, at *4 & n.8 (S.D. Cal. Jan. 16, 2008) (rejecting corporate officers' claim of privilege because they failed to satisfy the fourth and fifth *Bevill* factors); *Tuttle v. Combined Ins. Co.*, 222 F.R.D. 424, 429 (E.D. Cal. 2004) (holding that "none of the *Bevill* factors which support the existence of an attorney/client relationship are present"); *see also United States v. Ferrell*, No. CR07-0066MJP, 2007 WL 2220213, at *4 (W.D. Wash. Aug. 1, 2007) (citing *Bevill* favorably); *Grassmueck v. Ogden Murphy Wallace, PLLC*, 213 F.R.D. 567, 571-72 (W.D. Wash. 2003) (applying the *Bevill* test).

[9] There are strong policy reasons to adopt the *Bevill* test. As noted above, any time a corporation retains counsel, counsel will have to talk to individual employees to represent the company effectively. The *Bevill* test responds to this reality by ensuring that a corporation is free to obtain information from its officers, employees, and consultants about company matters and then control the attorney-client privilege, waiving it when necessary to serve corporate interests. The test also

---

[8]Other circuits have cited *Bevill* favorably without adopting the five-factor test. *See In re Sealed Case*, 29 F.3d 715, 719 n.5 (D.C. Cir. 1994). The Fourth Circuit, for example, has considered adopting the *Bevill* test, but ultimately reserved decision on the issue. *In re Grand Jury Subpoena: Under Seal*, 415 F.3d 333, 340 n.6 (4th Cir. 2005) ("It is unnecessary to decide whether we find *Bevill* fully consistent with our views on this matter because based on the circumstances we have identified, it would not have been objectively reasonable for appellants to believe that the investigating attorneys represented them personally.").

preserves the individual's ability to claim a personal attorney-client privilege when the individual makes clear he or she is seeking personal legal advice and the communications relate to personal legal affairs, not to the company's business. Moreover, there are reasons to look to other circuits when contemplating the proper standard in this arena. As the Supreme Court cautioned in *Upjohn*, "[a]n uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all." 449 U.S. at 393. For these reasons, we adopt the *Bevill* test in the Ninth Circuit.

**[10]** Applying the five-part *Bevill* test in this case, Graf must establish: (1) he approached the attorneys for the purpose of seeking legal advice; (2) when he did so, he made it clear to the attorneys that he was seeking legal advice in his individual rather than in his representative capacity; (3) the attorneys saw fit to represent him personally, knowing a conflict could arise; (4) his conversations with the attorneys were in confidence; and (5) "the substance of [his] conversations with [the attorneys] did not concern matters within [Employers Mutual] or the general affairs of [Employers Mutual]." *Bevill*, 805 F.2d at 123. We agree with the district court that Graf fails to meet factors two, three, and five as to all of the named attorneys.[9]

### 1

Both Hugh Alexander and Stephen Fitzsimmons worked for Alexander & Crabtree, P.C., which later became known as the Alexander Law Firm, P.C. (the "Alexander Firm"). The

---

[9]The district court also found that Graf failed the first factor because he sought legal advice on behalf of Employers Mutual, not on his own behalf. However, because Graf and Employers Mutual likely had similar legal concerns we here focus on the other factors, which are sufficient to demonstrate that Graf does not hold a personal attorney-client privilege with the named attorneys.

Alexander Firm was retained to represent Employers Mutual on February 12, 2001. The attorney retainer agreement was signed by Kokott on behalf of Employers Mutual. Both Alexander and Fitzsimmons indicated in sworn declarations that, although Graf was the primary person from whom they received information regarding Employers Mutual, Graf was not the firm's client. Neither attorney ever informed Graf that he was their client. Nor did they specifically inform Graf that he was not their client.

All matters discussed with Graf related to the Alexander Firm's representation of Employers Mutual. Employers Mutual paid the firm's bills and all the checks were signed by Kokott. The Alexander Firm stopped representing Employers Mutual on October 12, 2001, when the Firm sent a letter to Kokott terminating the relationship.

Fitzsimmons further indicated in his declaration that "Graf never discussed with [him] nor sought [his] advice about any personal legal matter or any personal liability he might have in connection with Employers Mutual or any other matter." Alexander acknowledged that in 1996 and 1997 Alexander had represented Prime Health Systems, Inc. ("Prime Care").[10] He explained that the prior matter was unrelated to his representation of Employers Mutual and covered a completely different subject matter; the representation of Prime Care related to the potential acquisition of an insurance company, whereas Employers Mutual hired the Alexander Firm to review insurance policies that Employers Mutual planned to use in connection with its employer welfare program, and to determine whether the policies met federal and state law requirements. There was some disagreement regarding whether Alexander had represented Graf personally during this earlier representation; for the purposes of this opinion, we assume that he did.

---

[10]This company is alternately referred to as Prime Care Health Network, Inc., Prime Health Systems, Inc., and Prime Healthcare. For ease of reference, we refer to it as Prime Care.

Graf testified that he believed that his conversations with Fitzsimmons and Alexander were covered by attorney-client privilege. He believed that he was the holder of the privilege, and no one ever indicated that this belief was incorrect. However, Graf acknowledged that he never paid the Alexander Firm during the 2001 representation. Finally, Graf testified that Fitzsimmons and Alexander had, on one occasion, discussed Graf's personal legal issues with him. In support of this claim Graf pointed to a single billing entry which listed a telephone conference between Graf and Fitzsimmons to discuss "Jim Graf issues," which he stated were issues personal to him. However, the district court found that the billing entry did not pertain to personal legal advice rendered to Graf, but rather described a conference between Alexander and Fitzsimmons regarding "Jim Graf's questions and concerns re structuring association as a union and having its plan established in connection with a collective bargaining agreement." Having examined the billing entry in question, we hold that this finding is not clearly erroneous.

**[11]** Graf's admission at the pre-trial motion hearing that he never requested that the Alexander Firm represent him personally causes him to fail the second and third *Bevill* factors. He never made it clear to the attorneys that he was seeking legal advice in his individual capacity; thus, neither attorney could choose to represent him, knowing that a conflict could arise. *See Bevill*, 805 F.2d at 123. Both Alexander and Fitzsimmons believed they represented only Employers Mutual. The fact that the retainer agreement was signed by Kokott on behalf of Employers Mutual and the firm's bills were paid by the company supports the attorneys' understanding.

**[12]** Finally, Graf fails the fifth *Bevill* factor because the substance of his conversations with both Alexander and Fitzsimmons related to his official duties at Employers Mutual and the general affairs of the company. Graf's testimony regarding the billing entry referring to "Jim Graf issues" is rebutted by the billing statement itself, which related to the

operation of Employers Mutual. No other testimony or evidence supports Graf's assertion that he sought advice on matters unrelated to his duties at Employers Mutual. Alexander's previous representation of Graf does not alter these determinations. Alexander did not ultimately testify at trial. Nor did Graf rebut Alexander's hearing testimony that the subject matter of the two representations was different and that they were separated by several years.

**2**

Michael Connors is one of the founding partners of Smith & Downey in Hauppauge, New York. Employers Mutual retained Smith & Downey on April 17, 2001. The engagement letter was sent to Kokott as Chairman of Employers Mutual, as were all bills, and all payments to Smith & Downey were signed by Kokott on behalf of Employers Mutual. Connors explained that Graf was his primary source of information about Employers Mutual. However, he stated that "[n]either I, nor my firm, Smith & Downey have ever represented James Graf." All discussions between Connors and Graf related to the firm's representation of Employers Mutual and Graf indicated in his communications to Connors that the advice was sought "in the best interest of Employers Mutual." Connors acknowledged that he never told Graf that he was not the holder of the attorney-client privilege. He asserted, however, that he would have refused to represent Graf personally had he ever been asked.

Graf testified that he believed his conversations with Connors were privileged and that he was the holder of the privilege "[b]ecause of the work [Graf] did on behalf of the corporation." However, he acknowledged that he never personally paid Smith & Downey.

**[13]** Graf's own testimony dooms his claim of personal attorney-client privilege as to Connors. Graf testified that he believed he held the privilege "[b]ecause of the work [he] did

on behalf of the corporation," and that he understood that he was getting legal advice on behalf of the corporation. This alone causes him to fail the second, third, and fifth *Bevill* factors—Graf was not seeking personal legal representation, therefore, he did not make it clear to Connors that he was; Connors did not decide to represent him individually; and he and Connors discussed only the company's business.

**3**

Ralph Agnello was Employers Mutual's general counsel from approximately January to June 2001. Agnello stated in his sworn declaration that, as general counsel, his client was Employers Mutual, not any of its directors, officers, employees, or consultants. He was paid by Employers Mutual, not by Graf. Agnello stated that he did not represent Graf personally while he was general counsel for Employers Mutual, and he and Graf did not discuss Graf's personal liability during that time. In fact, Agnello testified that he did "exceptionally little" as general counsel for Employers Mutual.

However, Agnello did represent Graf personally both before and after he was general counsel for Employers Mutual. Starting in the mid-1980s and continuing until the late-1990s, Agnello intermittently represented Graf in an individual capacity on a variety of matters, including family law, bankruptcy, and business matters related to the California Department of Insurance's investigation of Prime Care. None of these personal matters was legally or factually related to the matters Agnello handled at Employers Mutual. After Employers Mutual was shut down by the DOL, Agnello advised Graf regarding complaints he was drafting pro se against representatives of the DOL.

**[14]** Graf presented no evidence that he ever asked Agnello to represent him personally while Agnello was general counsel for Employers Mutual, or that Agnello agreed to the dual-representation after considering potential conflicts.

This failure to meet the second and third *Bevill* factors can perhaps be forgiven considering Agnello's long history with Graf. However, the district court found that there was no evidence that Graf spoke with Agnello about anything other than Employers Mutual's business during Agnello's time as general counsel. This finding is supported by the record, which demonstrates that Graf did not testify, or present other evidence, that he sought personal legal advice from Agnello in 2001. Therefore, the finding is not clearly erroneous and nothing about which Agnello could testify regarding his role as general counsel to Employers Mutual could impose on any individual attorney-client privilege held by Graf.

**[15]** We hold that under the *Bevill* test Graf does not hold a personal attorney-client privilege over any of his communications with the above attorneys. Therefore, we need not examine the government's remaining arguments regarding waiver and harmless error.

### III

Graf's second argument on appeal relates to attorney Connors's trial testimony. Connors twice stated that marketing the Plans would be a criminal offense because they did not comply with federal or state law, which Graf argues is inadmissible lay opinion evidence. During direct examination, Connors testified that the Employers Mutual insurance program did not comply with all applicable laws. Connors explained that he was first contacted by Graf after Connors advised a client not to market Employers Mutual's Plans. He explained to Graf that he had given this advice to his client because marketing non-compliant plans is a crime. Upon admitting a letter written by the Smith & Downey firm to Employers Mutual indicating that the Plans did not fully comply with ERISA, the court issued a limiting instruction, informing the jury that the information was admitted "only for the purpose of what information was communicated to the defendant and to Employers Mutual regarding these matters of federal and state law, not

for the truth of the opinions or the information stated in the letter."

Connors also testified that he had only agreed to represent Employers Mutual after Graf had assured him that the company would cease marketing the Plans until they complied with all relevant federal and state laws. During cross-examination, Graf's counsel attacked Connors's credibility, arguing that there was no documentation to support his claim that he refused to represent Employers Mutual unless it ceased marketing the non-compliant Plans. Thus, on redirect, Connors clarified that he remembered making Employers Mutual promise not to market the Plans while he represented the company because he believed it would be criminal to participate in marketing a non-compliant product.

**[16]** Graf contends that Connors's testimony[11] was improper lay opinion testimony in violation of Federal Rule of Evidence ("FRE") 701, which states,

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of [FRE] 702.

Fed. R. Evid. 701. The parties agree that Connors was not testifying as a legal expert.

Graf did not object to this testimony at trial; therefore, we review the admission of the testimony for plain error. *United*

---

[11]Graf only challenges the admission of Connors's statements that marketing the Plans was criminal. He does not object to the testimony that the Plans failed to comply with state and federal law.

*States v. Sioux*, 362 F.3d 1241, 1244 n.5 (9th Cir. 2004). To merit reversal under the plain error standard, "[t]here must be an 'error' that is 'plain' and that 'affect[s] substantial rights.' " *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)) (second alteration in original). The decision to correct such an error rests within the court's discretion, which should not be exercised "unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " *Olano*, 507 U.S. at 732 (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)) (alteration in original).

**[17]** We hold that there was no plain error in admitting Connors's testimony. The statement on direct examination that the Plans did not comply with state and federal law and that marketing them would be a crime was admissible to show that Graf was on notice that his conduct was illegal. *See United States v. McLennan*, 563 F.2d 943, 946 (9th Cir. 1977) (noting that attorney's statement that he told the defendant that his actions were illegal was admitted not to prove that the actions were illegal, but to show that the defendant had been warned of the illegality). The second statement was admissible to show why Connors remembered the substance of his testimony.

Graf's reliance on *United States v. Henke*, 222 F.3d 633 (9th Cir. 2000), is misplaced. In *Henke*, we held that the admission of lay opinion testimony that the defendant "must have known" about a false revenue reporting scheme was error. *Id.* at 641-42. Connors did not testify that Graf "must have known" his conduct was illegal, he testified that he personally told Graf the conduct was illegal. It is the jury's job to determine what the defendant knew. *See id.* at 642. Connors did not invade the province of the jury when he testified regarding what he told Graf; his testimony merely aided the jury in making the determination as to whether Graf knowingly violated federal and state law by persisting in his conduct after receiving Connors's advice. Thus, Connors's testimony was rationally based on his own perception and

"helpful to . . . the determination of a fact in issue." *See* Fed. R. Evid. 701. The jury by its verdict credited Connors's warning to Graf. Its admission was not error; certainly not plain error.

## IV

Graf's third argument on appeal relates to his conviction under Counts 7 through 16 for misappropriation in connection with a health care benefit program in violation of 18 U.S.C. § 669. The ten counts correspond to ten checks drawn on an Employers Mutual bank account and made payable to Graf's shell company, Colombia. Graf moved for a judgment of acquittal on these Counts at the close of both the government and defense cases pursuant to Rule 29, which provides, "After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The district court reserved ruling on the motion under Rule 29(b) until after the jury verdict and then, after briefing and argument, denied the motion.[12]

Graf presents two bases to support his Rule 29 argument on appeal. First, Graf argues that the language of § 669 unambiguously requires the existence of a valid, non-fraudulent health care benefit program. Second, Graf renews his defense pressed before the district court, without citation to any authority or any facts in the record, that the diverted funds were Trade Association membership fees rather than health care benefit program funds.

---

[12]Rule 29(b) provides, "The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b).

"A motion for Judgment of Acquittal is reviewed on a sufficiency-of-the-evidence standard." *United States v. Stoddard*, 150 F.3d 1140, 1144 (9th Cir. 1998). "Under that standard, evidence supports a conviction, if, viewed in the light most favorable to the government, it would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *Id.* A defendant need not state specific grounds to support a Rule 29 motion, *United States v. Navarro Viayra*, 365 F.3d 790, 793 (9th Cir. 2004); however, when a Rule 29 motion is made on a specific ground, other grounds not raised are waived, *United States v. Quintana-Torres*, 235 F.3d 1197, 1199 (9th Cir. 2000). We may review a waived ground for acquittal only "to prevent a manifest miscarriage of justice." *Id.*

We hold that Graf's first argument is waived because he failed to raise it before the district court. *See id.* We review it only "to prevent a manifest miscarriage of justice." *See id.* The second argument appears to have been mostly abandoned on appeal, as Graf refers to it in only two sentences in his opening brief, without citation to law or to the record. Arguments made in passing and not supported by citations to the record or to case authority are generally deemed waived. *United States v. Williamson*, 439 F.3d 1125, 1138 (9th Cir. 2006) (citing Fed. R. App. P. 28(a)(9)(A)). We, therefore, likewise review it only "to prevent a manifest miscarriage of justice." *See Quintana-Torres*, 235 F.3d at 1199.

**A**

"In construing the provisions of a statute, we first look to the language of the statute to determine whether it has a plain meaning." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009) (citing *McDonald v. Sun Oil Co.*, 548 F.3d 774, 780 (9th Cir. 2008)). When the language is unambiguous, the court's inquiry begins and ends with the statutory text. *Id.* (quoting *McDonald*, 548 F.3d at 780).

Both Graf and the government agree that the language of § 669 is unambiguous and that we need look no further than the statutory language in our analysis. We agree. Section 669 provides in relevant part:

> Whoever knowingly and willfully embezzles, steals, or otherwise without authority converts to the use of any person other than the rightful owner, or intentionally misapplies any of the moneys, funds, securities, premiums, credits, property, or other assets of a health care benefit program, shall be fined under this title or imprisoned not more than 10 years, or both
> . . . .

18 U.S.C. § 669(a). A "health care benefit program" is "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual . . . ." *Id.* § 24(b).

**[18]** By its plain language, the statute prohibits misappropriating funds from a plan or contract that provides any medical benefit to any individual. Graf's testimony in the related civil case established that Graf had developed the Plans to sell health insurance. And ultimately, about $1.7 million in medical claims were actually paid by Employers Mutual. These payments were a medical benefit to the few lucky individual beneficiaries for whom they were made. Because Graf had underinsured the risk, it was inevitable that the house of cards would ultimately collapse, leaving thousands of individuals without health care coverage. However, Employers Mutual did sell health care plans, affecting commerce, which provided medical benefits to some of the individual insureds.

**[19]** Graf does not explain what part of the statutory language precludes a violation when the health care benefit program is primarily a fraudulent entity. We see no such language. Nor do Graf's citations to cases in which courts have found violations of § 669 when individuals have

defrauded legitimate insurance companies and medical care providers convince us that Employers Mutual is not a health care benefit program. Employers Mutual meets the unambiguous statutory definition of a health care benefit program, even though it was primarily a vehicle for major health care fraud. By finding Graf guilty on all counts under § 669, the jury apparently agreed. Graf's convictions under § 669 do not constitute a manifest miscarriage of justice.[13] *See Quintana-Torres*, 235 F.3d at 1199.

**B**

Before the district court Graf argued that the government had failed to distinguish between membership fees paid to the Trade Associations and insurance premiums paid to Employers Mutual. He contends that only the latter could qualify as health care benefit program funds. Graf concludes that the government's failure to demonstrate conclusively the provenance of the transferred funds was fatal to the charges brought pursuant to § 669, and that the district court should, therefore, have granted his Rule 29 motion. We reject Graf's argument.

First, a rational trier of fact could reasonably have determined that, however labeled, membership fees were "moneys, funds, securities, premiums, credits, property, or other assets of a health care benefit program." 18 U.S.C. § 669(a). Second, even assuming, for the sake of argument, that Graf's distinction between insurance premiums and Trade Association membership fees is valid, a rational trier of fact could have found that the government presented sufficient evidence to establish that the funds were actually insurance premiums. Viewing the evidence in the light most favorable to the gov-

---

[13]At several points in his brief, Graf contends that the government has taken inconsistent positions regarding Employers Mutual's status as both a fraudulent entity and a victim of Graf's embezzlement. Because Graf's conviction under § 669 does not require proof that Employers Mutual is a legitimate company, there is no inconsistency between these positions.

ernment, as we must, the evidence demonstrates that Employers Mutual failed to segregate its bank accounts to maintain even an artificial distinction between insurance premiums and membership fees, that the company's invoices referred only to premiums, and that the victims' checks referred only to premiums. A rational trier of fact could have concluded, based on this evidence, that the money Graf transferred to Colombia was entirely made up of insurance premiums. Graf cannot show that no rational juror could have found him guilty of a violation of § 669 based on the evidence presented, and his convictions under that statute were not a manifest miscarriage of justice. *See Quintana-Torres*, 235 F.3d at 1199.

## V

Graf's final argument on appeal is that the district court erred in its May 14, 2009, order denying Graf's motion to provide his counsel with documents submitted by the government under seal and in camera.[14] Graf argues that filing these documents under seal and maintaining them under seal violates his First Amendment right of access and his Sixth Amendment right to confront the witnesses against him. He also contends that the filings might implicate the Jencks Act, 18 U.S.C. § 3500, and the Canons of Judicial Ethics.

"Although [Graf] creatively argue[s] for a constitutional right of access, [he is] clearly challenging the district court's discovery [and trial management] rulings regarding sealed

---

[14]The procedural history of this claim is somewhat unusual. Instead of filing an opening brief with us on November 10, 2008, Graf filed a motion to have the record corrected and to unseal pleadings. On January 22, 2009, we remanded the case to the district court to decide, in the first instance, whether the relevant documents should be unsealed. The district court denied the motion on May 14, 2009. The case then returned to us and Graf's renewed motion was denied without prejudice on August 17, 2009, by a two judge panel. Graf has now renewed his argument regarding the sealed documents for a third time in the supplemental opening brief and excerpts of record.

and in camera documents." *United States v. Shryock*, 342 F.3d 948, 983 (9th Cir. 2003). "We review a district court's discovery rulings for an abuse of discretion." *Id.* (citing *United States v. Chon*, 210 F.3d 990, 994 (9th Cir. 2000)).

The government and the district court have divided the relevant documents into three categories: (1) a government request for judicial notice and related pleadings; (2) government witness statements; and (3) a "trial strategy document" listing the witnesses and briefly summarizing their anticipated testimony, filed by the government at the request of the district court. The district court found that the request for judicial notice was served on Graf's trial counsel. It also found that the request was properly filed under seal pursuant to Rule 6(e) because it contains information from grand jury proceedings. *See* Fed. R. Crim. P. 6(e) (providing that an attorney for the government may not disclose a matter occurring before the grand jury except under circumstances not occurring here). We have reviewed the documents and the record and conclude that the district court did not abuse its discretion in sealing the request for judicial notice and maintaining the documents under seal.

The district court found that the witness statements for those who testified were disclosed to Graf and his counsel during pre-trial discovery and that these materials were properly filed under seal. Some of the statements contain grand jury testimony covered by Rule 6(e), and others contain sensitive personal information pertaining to potential witnesses, some of whom never even testified. Graf can point to no witness who testified to matters not disclosed to him prior to trial. We hold that the district court did not abuse its discretion in sealing the remaining witness statements and maintaining them under seal.

Finally, on September 22, 2005, faced with a trial involving more than 100 witnesses that would take several weeks of courtroom time, the district court ordered the government to

provide the court with a summary description of the testimony anticipated from each witness and the substance of the exhibits the government intended to introduce in its case-in-chief. The district court employed this tool after determining that it needed a preview of the government's case to manage a lengthy trial by making sure that "the government did not intend to adduce evidence that was only tangentially relevant or duplicative." It permitted the government to file the document under seal to prevent disclosure of the government's trial strategy. In its May 14, 2009, order, the district court concluded that unsealing the information was unnecessary to aid Graf in his appeal, and inappropriate because if Graf prevails on appeal the government may need to retry some or all of the case.

**[20]** Graf alleges that the district court was improperly influenced by this trial strategy document and that his inability to review the document has prevented him from bringing additional claims on appeal. A district court has broad authority to enter pretrial case management orders to ensure that the trial proceeds efficiently. *United States v. W.R. Grace*, 526 F.3d 499, 508-09 (9th Cir. 2008) (en banc). Further, judges are presumed to not be prejudiced by impermissible factors, such as the examination of evidence which the jury may never see. *United States v. Howard*, 480 F.3d 1005, 1012 (9th Cir. 2007) (citing *United States v. Zuber*, 118 F.3d 101, 104 (2d Cir. 1997)). After having examined the trial strategy document, we cannot see how it could have improperly influenced the district court. In combination with the presumption that the district court was not impermissibly influenced, Graf's argument must fail.

**[21]** We hold that the district court did not abuse its discretion in requesting, for case management purposes, the government's summary document, in allowing it to be filed under seal, or in maintaining it under seal. We have examined Graf's remaining arguments for access to the sealed records and find none persuasive.

**AFFIRMED**.