# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
October 3, 2018 Session

## DIALYSIS CLINIC, INC. v. KEVIN MEDLEY ET AL.

**Appeal by Permission from the Court of Appeals**
**Circuit Court for Davidson County**
**No. 14C4843     Joseph P. Binkley, Jr., Judge**

———————————————————

**No. M2017-01352-SC-R11-CV**

———————————————————

In this interlocutory appeal, we address whether the attorney-client privilege protects communications between a corporation's legal counsel and a third-party nonemployee of the corporation. After acquiring four commercial properties, a corporation filed unlawful detainer actions against the properties' tenants. The tenants subpoenaed documents from a property management company hired by the corporation to manage its properties. The corporation and the property management company objected to producing documents containing communications between the corporation's legal counsel and the property management company, arguing that the attorney-client privilege protected the documents. The trial court held that the documents were protected because the attorney-client privilege extended to the property management company as an agent of the corporation. We hold that the attorney-client privilege applies to communications between an entity's legal counsel and a third-party nonemployee of the entity if the nonemployee is the functional equivalent of the entity's employee and when the communications relate to the subject matter of legal counsel's representation of the entity and the communications were made with the intention that they would be kept confidential. Applying this framework, we hold that the property management company was the functional equivalent of an employee of the corporation, that the communications related to the subject matter of counsel's representation of the corporation, and that the communications were made with the intention that they would be kept confidential. We affirm the ruling of the trial court and remand to the trial court for further proceedings.

**Tenn. R. App. P. 11 Appeal by Permission from Denial of Rule 9 Application;**
**Ruling of the Trial Court Affirmed; Case Remanded to the Trial Court**

SHARON G. LEE, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and CORNELIA A. CLARK, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

L. Vincent Williams, Nashville, Tennessee, and J. Ryan Poole, Hermitage, Tennessee, for the appellants, Kevin Medley, individually; Kevin Medley, LLC; Canvas Lounge, LLC; and 3 Entertainment Group, LLC.

Peter C. Sales and Frankie N. Spero, Nashville, Tennessee, for the appellee, Dialysis Clinic, Inc.

**OPINION**

I.

Dialysis Clinic, Inc. (Dialysis Clinic) owned and operated dialysis centers. In addition, Dialysis Clinic owned and leased various commercial properties to third parties. Dialysis Clinic did not have in-house knowledge about or experience in the management of commercial rental properties. For that reason, Dialysis Clinic had a property management agreement with XMi Commercial Real Estate (XMi) to manage several of Dialysis Clinic's commercial properties. Under the property management agreement, XMi acted as Dialysis Clinic's agent on an exclusive basis to manage and operate properties. XMi's scope of work under the agreement included negotiating lease renewals and amendments; collecting rents and dues; canceling or terminating leases upon Dialysis Clinic's direction; and instituting, prosecuting, and defending actions involving the leases and properties.

XMi handled all day-to-day operations and tenant relations and regularly communicated with Dialysis Clinic about those matters. XMi also communicated with Dialysis Clinic's in-house and outside counsel about the properties because, in XMi's role as property manager, it had information about the properties that Dialysis Clinic did not have.

In July 2012, Dialysis Clinic acquired four commercial properties on Church Street in Nashville. The properties were occupied by Canvas Lounge, LLC; 3 Entertainment Group, LLC d/b/a WKND; and OutCentral, Inc. under a series of leases and sub-leases, the complicated history of which is immaterial.

In October 2014, Dialysis Clinic filed unlawful detainer actions in the Davidson County General Sessions Court against Kevin Medley, individually; Kevin Medley, LLC; Canvas Lounge, LLC; 3 Entertainment Group, LLC; and OutCentral, Inc.[1] On motion of

---

[1] Three separate unlawful detainer actions were filed—one naming as defendants Kevin Medley and Canvas Lounge, LLC; a second naming as defendants Kevin Medley, individually, and d/b/a Kevin Medley, LLC and OutCentral, Inc.; and a third naming as defendants Kevin Medley and 3 Entertainment

Kevin Medley, individually; Kevin Medley, LLC; Canvas Lounge, LLC; and 3 Entertainment Group, LLC (the Defendants), the General Sessions Court consolidated the cases and removed them to Davidson County Circuit Court (the trial court).

After the cases were removed to the trial court, the Defendants served a subpoena on XMi, a nonparty to the detainer action, for production of documents related to the Church Street properties. XMi withheld a number of documents from production based on the attorney-client privilege. Those documents included emails between XMi and Dialysis Clinic's in-house and outside counsel. Dialysis Clinic contends that these emails are protected by the attorney-client privilege based on the agency relationship between Dialysis Clinic and XMi.

After an evidentiary hearing and in-camera review of the disputed documents, the trial court ruled that the attorney-client privilege applied to XMi's communications with Dialysis Clinic's attorneys and that XMi had properly withheld emails containing those communications from its document production. The trial court granted the Defendants' motion for an interlocutory appeal under Tennessee Rule of Appellate Procedure 9. The Court of Appeals denied the Defendants' application. The Defendants then filed an application under Tennessee Rule of Appellate Procedure 11 for review by this Court, which we granted.

This Court's review on interlocutory appeal is limited to the issue certified to it by the trial court. *Wallis v. Brainerd Baptist Church*, 509 S.W.3d 886, 896 (Tenn. 2016). Here, the certified issue is whether the trial court extended the attorney-client privilege beyond what Tennessee law allows by finding that XMi properly withheld certain documents from production based on attorney-client privilege because of its agency relationship with Dialysis Clinic.

We review a trial court's rulings on the application of the attorney-client privilege under an abuse of discretion standard. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002) (citing *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000); *Frontier Refining, Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 699 (10th Cir. 1998)); *see also Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (citing *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d 22, 42 (Tenn. 2005); *Benton v. Snyder*, 825 S.W.2d 409, 416 (Tenn. 1992); *Loveall v. Am. Honda Motor Co.*, 694 S.W.2d 937, 939 (Tenn. 1985)). "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal

---

Group, LLC d/b/a WKND. Defendant OutCentral, Inc. is represented in the lawsuit by separate counsel and is not a party to this appeal.

standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc.*, 312 S.W.3d at 524 (citing *State v. Ostein*, 293 S.W.3d 519, 526 (Tenn. 2009); *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008); *Roman Catholic Diocese of Nashville*, 154 S.W.3d at 42). We review the trial court's factual findings underlying a discretionary decision under a preponderance of the evidence standard. *Boyd*, 88 S.W.3d at 212. We review the trial court's legal determinations de novo without a presumption of correctness. *Id.* (citing *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 66 (Tenn. 2001); *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001); *Grand Jury Proceedings v. United States*, 156 F.3d 1038, 1042 n.1 (10th Cir. 1998)).

II.

The attorney-client privilege "encourages full and frank communication between attorney and client by sheltering these communications from disclosure." *State ex. rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Group Trust, Inc.*, 209 S.W.3d 602, 615–16 (Tenn. Ct. App. 2006) (citing Tenn. Code Ann. § 23-3-105; *Federal Ins. Co. v. Arthur Anderson & Co.*, 816 S.W.2d 328, 330 (Tenn. 1991)). The privilege is codified at Tennessee Code Annotated section 23-3-105,[2] but whether it applies to a communication is "necessarily question, topic and case specific." *Bryan v. State*, 848 S.W.2d 72, 80 (Tenn. Crim. App. 1992) (citing *Johnson v. Patterson*, 81 Tenn. 626, 649 (1884)). For the privilege to apply, "[t]he communication must involve the subject matter of the representation and must be made with the intention that the communication will be kept confidential." *Flowers*, 209 S.W.3d at 616 (citing *Bryan*, 848 S.W.2d at 80). The privilege protects both the client's communications to the attorney and the attorney's communications to the client when the communications are based on the client's communications or when disclosure of the attorney's communications would reveal the substance of the client's communications. *Boyd*, 88 S.W.3d at 213 (citing *Burke v. Tenn. Walking Horse Breeders' & Exhibitors' Ass'n*, No. 01A01-9611-CH-00511, 1997 WL 277999, at *11 (Tenn. Ct. App. May 28, 1997); *Bryan*, 848 S.W.2d at 80)).

The attorney-client privilege, however, does not protect communications between attorneys and clients that take place in the presence of a third party or are divulged to a third party. *Id.* (citing *Hazlett v. Bryant*, 241 S.W.2d 121, 123 (Tenn. 1951); *Taylor v. State*, 814 S.W.2d 374, 377 (Tenn. Crim. App. 1991)). That said, when the third party is an agent of the client, the attorney-client privilege applies. *Smith Cnty. Educ. Ass'n v.*

---

[2] "No attorney, solicitor or counselor shall be permitted, in giving testimony against a client or person who consulted the attorney, solicitor or counselor professionally, to disclose any communication made to the attorney, solicitor or counselor as such by such person during the pendency of the suit, before or afterward, to the person's injury." Tenn. Code Ann. § 23-3-105 (2009).

*Anderson*, 676 S.W.2d 328, 333 (Tenn. 1984) (citing McCormick § 91 (2d. ed. 1972); D. Paine, *Tennessee Law of Evidence*, § 92, at 112 (1974)). In *Smith County*, a third party who served as a negotiator between the school board and the teachers' union attended a meeting between the school board and its attorneys about the pending litigation. *Id.* at 330–31. We held that under these facts the attorney-client privilege applied because the third-party negotiator was acting as an agent of the school board. *Id.* at 333. We, however, did not define who is an "agent" of the client for purposes of the privilege. *Id.*

The Eighth Circuit Court of Appeals in *In re Bieter Co.*, 16 F.3d 929, 938 (8th Cir. 1994) analyzed the privilege issue as whether the nonemployee agent of a corporation or partnership is the "functional equivalent of an employee" whose "involvement in the subject of the litigation makes him precisely the sort of person with whom a lawyer would wish to confer confidentially in order to understand [the corporate client's] reasons for seeking representation."

The *Bieter* court found that it was not appropriate to distinguish between a corporation or partnership's employees and those who work as independent contractors. *Id.* at 937. The privilege rests on the need for an attorney to have all the information that relates to his or her representation of the client. *Id.* (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). In *Upjohn*, the United States Supreme Court recognized that any corporate employee, including middle-level and even lower-level employees, can have relevant information that a corporation's attorney needs to advise the corporate client. 449 U.S. at 391. The issue of nonemployee agents was not presented to the *Upjohn* Court, but the Court's reasoning has been extended to nonemployee independent contractors by the *Bieter* court and many others.

In *Bieter*, an independent contractor worked as a consultant to a partnership on a commercial development. 16 F.3d at 933. The independent contractor worked to procure tenants and acted as the representative of the partnership with architects, other consultants, and the partnership's attorneys. *Id.* at 934. His interactions with the partnership's attorneys were extensive and included meetings (with or without the company's principals) and correspondence with the attorneys. *Id.* The *Bieter* court observed that although the information an attorney needs to represent a client will in most cases be available from the client's employees, there will also be nonemployees whose relationship to the client means that they possess "the very sort of information that the privilege envisions flowing most freely." *Id.* at 937–38. Because the independent contractor in *Bieter* had been involved daily with the partnership's principals and as a representative of the partnership with local officials and potential tenants, the court found that the independent contractor likely possessed information that no one else had. *Id.* at 938. The *Bieter* court held that "he was in all relevant respects the functional equivalent of an employee." *Id.* After further analysis, the *Bieter* court held that the attorney-client

privilege protected the communications between the partnership's attorneys and the independent contractor.[3] *Id.* at 939–40.

The federal district court in the Western District of Tennessee followed the *Bieter* court's functional equivalent analysis in *Royal Surplus Lines Insurance Co. v. Sofamor Danek Group*, 190 F.R.D. 463 (W.D. Tenn. 1999), noting that Tennessee courts are often guided by state and federal common law when determining the limits of the attorney-client privilege. *Id.* at 484 (citing *State v. Bobo*, 724 S.W.2d 760 (Tenn. Crim. App. 1981); *Schneider v. Troxel Mfg. Co.*, 1988 WL 130351 (Tenn. Ct. App. Dec. 7, 1988)).

The *Royal Surplus* court explained that the federal court's duty, with no controlling Tennessee law, was to formulate a rule that the Tennessee Supreme Court would most likely adopt if ruling on the same issue. *Id.* Based on its review of case law from other jurisdictions and secondary sources, the court found that *Bieter* was "highly persuasive authority on this issue." *Id.* at 485. The Tennessee Supreme Court had already recognized in *Smith County* that the attorney-client privilege could be extended to cover communications involving a representative of the client; the *Bieter* functional equivalent analysis informs the definition of "representative" or "agent" for extending the privilege. *Id.* Based on factually analogous cases from other jurisdictions, the *Royal Surplus* court held that the involvement of a nonemployee insurance broker in discussions with the insured corporation's attorney did not defeat the attorney-client privilege and that the privilege applied so long as the communications were made for the purpose of seeking legal advice and with the intention of keeping them confidential.[4] *Id.* at 486.

---

[3] After finding that the independent contractor was the functional equivalent of an employee, the *Bieter* court applied the five-factor test adopted by the Eighth Circuit in *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1977) to determine that the attorney-client privilege applied and had not been destroyed. The five factors are

(1)    The communication was made for the purpose of securing legal advice;
(2)    The employee making the communication did so at the direction of his corporate superior;
(3)    The superior made the request so that the corporation could secure legal advice;
(4)    The subject matter of the communication is within the scope of the employee's corporate duties; and
(5)    The communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents.

*Bieter*, 16 F.3d at 936.

[4] The *Royal Surplus* court did not, however, follow the *Bieter* court's use of the *Diversified* factors to determine whether the privilege should apply to communications involving the functional equivalent of an employee. The court instead looked to Tennessee case law for the criteria that the

The Middle District of Tennessee followed *Royal Surplus* in *Jones v. Nissan North America, Inc.*, No. 3:07-0645, 2008 WL 4366055, at *7 (M.D. Tenn. Sept. 17, 2008) to find that the medical director of Nissan's employee medical clinic was an insider for purposes of the attorney-client privilege even though she was employed by another entity and worked under contract at Nissan through that entity. She was the custodian of the records of medical restrictions on Nissan employees and had a significant relationship to Nissan and its involvement in an ongoing workers' compensation case. *Id.* The court found that under the analysis used in *Royal Surplus*, the medical director's presence during discussions with Nissan's attorneys in the workers' compensation case did not defeat the privilege. *Id.*

The Tennessee Court of Appeals recently applied the functional equivalent analysis in *Waste Administrative Services, Inc. v. Krystal Co.*, No. E2017-01094-COA-R9-CV, 2018 WL 4673616 (Tenn. Ct. App. Sept. 27, 2018). In *Krystal*, the Court of Appeals applied the attorney-client privilege to communications between in-house counsel at Krystal and an employee of an outside vendor, Denali Sourcing Services, Inc. *Id.* at *6. The Court of Appeals observed that there was no controlling Tennessee law, so it looked to case law from other jurisdictions, finding that in many jurisdictions, the attorney-client privilege is extended to include the functional equivalent of an employee. *Id.* at *3–5. The *Krystal* court determined that it was appropriate to apply the functional equivalent test because it "acknowledges the reality of corporate activity and is in keeping with *Upjohn*." *Id.* at *5. The written agreement between Krystal and Denali during the time period at issue on appeal explicitly disclaimed any kind of agency relationship. *Id.* at *1. But, the Court of Appeals noted, the inquiry must extend into how the parties conducted themselves. *Id.* at *5. The president of Krystal, in an email, had asked the Denali employee to "take the lead" on finding and negotiating a deal with a new waste services provider for Krystal. *Id.* After that email, the Denali employee was involved in internal-use-only communications, including those with Krystal's in-house counsel, about changing providers. *Id.* The Court of Appeals found that his activities "could scarcely be distinguishable from those of a Krystal employee" and that he was, therefore, the functional equivalent of a Krystal employee. *Id.* Consequently, communications with Krystal's counsel in which the Denali employee was involved qualified for the attorney-client privilege under the functional equivalent analysis. *Id.* at *6. The Court of Appeals remanded the case to the trial court to determine the applicability of the privilege on a document-by-document basis. *Id.*

The functional equivalent analysis has been widely accepted by courts in other jurisdictions. The Ninth Circuit Court of Appeals adopted it in *United States v. Graf*, 610

communications must have been made in the context of the attorney-client relationship and must have been intended to be kept confidential. *Id.* at 483 (citing *Bryan*, 848 S.W.2d at 80).

F.3d 1148 (9th Cir. 2010), a criminal case involving an insurance company accused of fraud. The owner of the company was prohibited under cease-and-desist orders from being employed by an insurance company, and therefore he denied that he was a director, officer, or employee of the company but claimed that he instead was an outside consultant. *Id.* at 1157. The *Graf* court found that the owner was the functional equivalent of a company employee because he was the company's agent with authority to communicate with its attorneys about the company's legal matters. *Id.* at 1159. He also communicated with insurance brokers and agents on behalf of the company and managed the company's employees. *Id.* Under a separate test,[5] the *Graf* court found that the company's owner, in his individual capacity as opposed to his role as a functional employee, was not represented by the company's attorneys. *Id.* at 1161–163. Thus, he had no personal attorney-client privilege over his communications with the company's attorneys, and they were free to testify against him in his personal capacity. *Id.* at 1164.

The federal district court in the Eastern District of Pennsylvania followed the functional equivalent approach in *In re Flonase Antitrust Litigation*, 879 F. Supp. 2d 454 (E.D. Pa. 2012). There, a pharmaceutical consulting firm was held to be the functional equivalent of an employee of a pharmaceutical company based on the firm's role in the development and implementation of a brand maturation plan, including administrative tasks and business strategy, as well as involvement in legal and regulatory issues. *Id.* at 456. The *Flonase* court found that the functional equivalent analysis "reflect[ed] the reality that 'corporations increasingly conduct their business not merely through regular employees but also through a variety of independent contractors retained for specific purposes.'" *Id.* at 460 (quoting Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* 269 (5th ed. 2007)).

In *In re Copper Market Antitrust Litigation*, 200 F.R.D. 213 (S.D.N.Y. 2001), the federal district court in the Southern District of New York used the functional equivalent analysis to determine that an outside public relations firm was the functional equivalent of an employee of the corporate client. The firm had been hired to deal with publicity surrounding an antitrust copper trading scandal. *Id.* at 215. The corporation itself had no internal resources sufficient to deal with the publicity. *Id.* The firm's duties included preparing statements for public release as well as statements informing the corporation's employees about what they could and could not say about the matter. *Id.* at 219. The firm had authority to make public relations strategy decisions, and the potential legal ramifications were factors that the firm considered when developing the statements. *Id.* at 216, 219. The firm was advised by the corporation's in-house counsel and was informed

---

[5] *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120 (3rd Cir. 1986) sets forth a five-part test to determine whether a corporate employee holds a personal attorney-client privilege over communications with attorneys for the corporation.

of his advice to the corporation about the scandal and resulting litigation. *Id.* at 219. The firm's communications with counsel were about matters within the scope of its work for the corporation, and the declarations of witnesses established that the firm understood that the purpose of the communications was to obtain legal advice from both in-house and outside counsel. *Id.* The court concluded, "[i]n applying the principles set forth by the Supreme Court in *Upjohn*, there is no reason to distinguish between a person on the corporation's payroll and a consultant hired by the corporation if each acts for the corporation and possesses the information needed by attorneys in rendering legal advice." *Id.* (citing *In re Grand Jury Subpoenas Dated January 20, 1998*, 995 F. Supp. 332, 340 (E.D.N.Y. 1998)).

The federal district court in Maryland held that a landscaping company, hired to address citations issued to a landowner by the county, was the functional equivalent of an employee of the landowner. *Huggins v. Prince George's Cnty.*, No. AW-07-825, 2008 WL 11366503, at \*4 (D. Md. Sept. 25, 2008). The company evaluated the violations charged in the citations, obtained approvals for permits on behalf of the landowner, and represented the landowner in interactions with county and state agencies. *Id.* at \*2–3. As part of its work and at the landowner's direction, the company communicated with the landowner's attorneys in confidence to provide information that the attorneys needed to defend against the citations and to pursue litigation against the county. *Id.* at \*3. The company was informed of the attorneys' legal advice and strategies so that it could perform work on the landowner's behalf. *Id.* The communications were considered confidential and were not shared with anyone other than the landowner's personnel and representatives with a need to know the contents. *Id.* The court found that all of these facts established the integral role the company played as consultant to the landowner. *Id. See also Medversant Techs., L.L.C. v. Morrisey Assocs., Inc.*, No. CV09-05031 MMM (FFMx), 2011 WL 13124128, at \*4–5 (C.D. Cal. July 20, 2011) (finding a public relations firm to be the functional equivalent of an employee that "essentially function[ed] as Medversant's public relations department," because it provided press releases and business development functions among other public relations duties, and therefore communications between the firm and Medversant's attorneys regarding review of press releases and legal advice about their contents were protected by the attorney-client privilege); *Am. Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.*, No. CV 05-5155(SJF)(AKT), 2008 WL 5231831, at \*2–3 (E.D.N.Y. Dec. 11, 2008) (holding that a construction management contractor was the functional equivalent of an employee of the insurance company—even though the contractor provided identical services to others on thousands of projects—because the company did not have the resources to oversee the project, the contractor had authority to negotiate contracts and make decisions for the company, the contractor's services required consultation with and legal advice from the company's attorneys, and the contractor was the "eyes and ears" for the company on day-to-day supervision of the project); *Stafford Trading, Inc. v. Lovely*,

No. 05-C-4868, 2007 WL 611252, at *6–7 (N.D. Ill. Feb. 22, 2007) (holding that under the functional equivalent analysis, an investment banking firm, although it served many clients, was the functional equivalent of an employee of the corporate client and that its communications with corporate counsel made for seeking or providing legal advice and treated as confidential qualified for the attorney-client privilege); *MLC Automotive, LLC v. Town of S. Pines*, No. 1:05CV1078, 2007 WL 128945, at *2–4 (M.D.N.C. Jan. 11, 2007) (finding that an engineer hired for development of an auto park was the functional equivalent of an employee since it was a specialized role that no employee or other agent of the company fulfilled, and as part of his work, the engineer communicated directly with the company's attorneys as their primary source of information about the property and his interactions with the town about regulatory approval); *cf. Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, No. CIV 08-1101-JB/RLP, 2009 WL 10706594, at *3–5 (D.N.M. Dec. 17, 2009) (finding email between the client corporation and its attorney that was subsequently shared with the corporation's accountant at an outside firm was not privileged because the accountant was not asked to provide opinions to the attorney so that the attorney could provide legal advice); *Horton v. United States*, 204 F.R.D. 670, 672 (D. Colo. 2002) (concluding that a property manager was not the functional equivalent of an employee for purposes of communicating with the client's attorneys about litigation because the property management agreement did not address the management of claims asserted in litigation, and a property manager does not necessarily have authority to manage litigation); *Export-Import Bank of U.S. v. Asia Pulp & Paper Co., Inc.*, 232 F.R.D. 103, 113 (S.D.N.Y. 2005) (holding that a financial consultant was not the functional equivalent of an employee because although he was intimately involved in the client company's restructuring talks and participated in communications with the company's attorneys, his "efforts [were] precisely those that any financial consultant would likely make under the circumstances"); *Banco do Brasil, S.A. v. 275 Washington St. Corp.*, No. 09-11343-NMG, 2012 WL 1247756, at *5–6 (D. Mass. Apr. 12, 2012) (holding that a real estate broker was not the functional equivalent of an employee because the broker's agreement contemplated that she could represent a prospective tenant while also serving as the company's real estate agent—thus defeating any assumption that she was to be a confidential representative of the company—and she had no expertise in regulatory approval and therefore would have had no need to communicate with the company's attorney on that issue).

After surveying the case law from other jurisdictions, we conclude that the functional equivalent analysis is a sound approach. We have synthesized the approach taken by courts in other jurisdictions to formulate the appropriate analysis for Tennessee courts to apply when determining, under the totality of the circumstances, whether a third-party nonemployee is the functional equivalent of an entity's employee whose communications with the entity's attorneys are protected by the attorney-client privilege. As a result, under this analysis, a court may find that a third-party nonemployee is the

functional equivalent of an employee after considering the following non-exclusive factors: whether the nonemployee performs a specific role on behalf of the entity; whether the nonemployee acts as a representative of the entity in interactions with other people or other entities; whether, as a result of performing its role, the nonemployee possesses information no one else has; whether the nonemployee is authorized by the entity to communicate with its attorneys on matters within the nonemployee's scope of work to facilitate the attorney's representation of the entity; and whether the nonemployee's communications with the entity's attorneys are treated as confidential.

If a court determines that the nonemployee's communications qualify for the attorney-client privilege because the nonemployee is the functional equivalent of an employee, then the court should use the standard already in place in Tennessee to determine whether the privilege attaches. Thus, on a case-by-case, communication-by-communication basis, the court should determine whether the communication involves the subject matter of counsel's representation of the entity and whether the communication was made with the intent that the communication be kept confidential.[6] *Flowers*, 209 S.W.3d at 616 (citing *Bryan*, 848 S.W.2d at 80); *Boyd*, 88 S.W.3d at 213 (citing *Burke*, 1997 WL 277999, at *11; *Bryan*, 848 S.W.2d at 80 (stating that the application of the privilege to any given communication is "necessarily question, topic and case specific")).

III.

Applying this analysis to the facts before us, we find that the attorney-client privilege applies to communications between Dialysis Clinic's legal counsel and XMi. The witness testimony shows that Dialysis Clinic hired XMi as its agent because of XMi's experience in property management, which Dialysis Clinic did not have in-house, and that XMi had primary responsibility for the day-to-day management of Dialysis Clinic's properties in Nashville. Dialysis Clinic's in-house counsel testified that during the purchase of the properties, it became apparent that Dialysis Clinic was stepping into unfamiliar territory and needed a professional hand to help guide and advise Dialysis Clinic and to run the properties on a day-to-day basis. Likewise, the testimony shows that there was a close working relationship between XMi and Dialysis Clinic on matters related to this litigation as well as other legal matters such as lease negotiation and drafting. Finally, numerous witnesses testified that because XMi managed the properties on a day-to-day basis and was the entity that interacted directly with the tenants, XMi had information about the properties that no one at Dialysis Clinic had.

---

[6] Here, like the *Royal Surplus* court, we depart from *Bieter* and find it appropriate to use this standard that is already firmly grounded in Tennessee law rather than adopting the *Diversified* factors relied on by the *Bieter* court.

Thus, under the criteria set forth above, we hold that XMi is the functional equivalent of an employee of Dialysis Clinic. There is no reason to distinguish XMi's role from that of a Dialysis Clinic employee, and XMi's involvement in the management of the Church Street properties makes it precisely the sort of entity with which Dialysis Clinic's attorneys would like to communicate because XMi possesses information that the attorneys need and that Dialysis Clinic does not have. XMi's duties also include potentially serving as trial witnesses, collecting information to prosecute claims related to the properties, and lease negotiations—all essential to both in-house and outside counsel in their representation of Dialysis Clinic. For that reason, Dialysis Clinic "could justifiably rely upon confidentiality in consultations [between XMi and] its own lawyer[s]." *Krystal*, 2018 WL 4673616, at *5.

We now turn to the second prong of the analysis—whether the communications related to the subject matter of legal counsel's representation of Dialysis Clinic and whether counsel made the communications with the intention that the communications be kept confidential. We presume that communications with an attorney are made for the sake of legal advice, *Bieter*, 16 F.3d at 938. Here, the witness testimony shows that the communications involving XMi and counsel for Dialysis Clinic were made for the purpose of seeking legal advice on issues involving the properties, which were the subject matter of the attorneys' representation. Dialysis Clinic's general counsel testified that XMi communicated with Dialysis Clinic's outside counsel at his direction because XMi had much of the information outside counsel needed at different times on lease transactional matters as well as litigation matters, including this lawsuit. In addition, Dialysis Clinic's general counsel testified he needed XMi's expertise about what to do with matters related to the leases on a day-to-day basis, which he, as a health care regulatory attorney, did not have. Outside counsel for Dialysis Clinic explained that they needed to communicate with XMi because XMi handled the day-to-day management of the Church Street properties and had information that the attorneys needed to fully advise Dialysis Clinic and represent Dialysis Clinic in litigation and other matters related to the properties. Current and former property managers at XMi stated that they communicated with counsel for Dialysis Clinic to provide information needed by the attorneys in their representation of Dialysis Clinic for investigation and assessment of legal matters. Finally, both in-house and outside counsel, and the employees of Dialysis Clinic and XMi who communicated with them, testified that they understood and intended for their communications to be confidential.

## CONCLUSION

Under the functional equivalent test that we have now adopted, we find that XMi operated as the "property management department" of Dialysis Clinic and as such was the functional equivalent of an employee of Dialysis Clinic. In addition, communications

between XMi and legal counsel for Dialysis Clinic related to the subject matter of counsel's representation of Dialysis Clinic and were made with the intention that the communications would be kept confidential. For that reason, we hold that the trial court did not extend the attorney-client privilege beyond what is allowed under Tennessee law and properly ruled that XMi did not have to produce certain documents because of its agency relationship with Dialysis Clinic. We affirm the ruling of the trial court and remand the case to the trial court for further proceedings consistent with this opinion. We tax the costs of this appeal to Appellants, Kevin Medley, individually; Kevin Medley, LLC; Canvas Lounge, LLC; and 3 Entertainment Group, LLC, for which execution may issue if necessary.

_____
SHARON G. LEE, JUSTICE